[L.A. No. 31851. Aug. 22, 1985.]

ANDREW LEONI et al., Petitioners, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**Counsel**

Horvitz & Levy, Ellis J. Horvitz and Ellen Lake for Petitioners.

Samuel Bufford, Gendel, Raskoff, Shapiro & Quittner and Fred Okrand as Amici Curiae on behalf of Petitioners.

Herbert M. Rosenthal, Truitt A. Richey, Jr., Ellen A. Pansky and R. Gerald Markle for Respondent.

**Opinion**

**THE COURT.**—What is the standard for determining whether a lawyer's solicitation of clients by mass mailings and informational pamphlets is misleading? We are asked to address this issue in our review of a recommendation of the State Bar that petitioners, Andrew Leoni and Houston Slate, be suspended from the practice of law for 30 days because their letter program—the mailing of some 250,000 letters and informational enclosures—allegedly violates the misleading or deceptive communications prohibition of Rule 2-101(A) of the Rules of Professional Conduct of the State Bar.[1]

---

[1]Unless otherwise indicated, all references to Rules or Rule refer to the Rules of Professional Conduct of the State Bar and portions thereof.

Petitioners contend that this regulation both on its face and as applied, violates the constitutional guarantee of freedom of speech.[2] The American Civil Liberties Union Foundation of Southern California (ACLU), amicus curiae on behalf of petitioners, argues that at issue is the proper standard for determining what constitutes misleading attorney advertising and solicitation; in addition it argues that in the case at bench the evidence is insubstantial to support the State Bar's findings. The ACLU further contends that in failing to make specific findings of violations and in recommending discipline for violations beyond those initially charged, the State Bar failed to comply with the requirement of due process of law.

We analyze petitioners' letter program under the line of cases according qualified protection to commercial speech and examine the cases and policies which govern misleading advertising generally. We hold that Rule 2-101(A)'s content-based regulations of misleading advertising are facially constitutional. Examining petitioners' letter campaign, we conclude that the letters are misleading and that, therefore, Rule 2-101 is also constitutional as applied. Given that this is an evolving area of law, we further conclude that suspension is inappropriately harsh and instead impose public reprimand to be served by this opinion. As for the letters, we conclude that the preferred and least restrictive constitutional remedy is to require petitioners to insert disclaimers or add clarifying language rather than total prohibition.

I. *The Slate & Leoni Letter Program*

Petitioners Houston Slate[3] and Andrew Leoni[4] are attorneys licensed to practice law in California. They practice under the name of Slate & Leoni, a professional corporation organized under California law. At all times relevant to this proceeding the practice of Slate & Leoni was exclusively before the federal bankruptcy courts.

In 1978, after studying the United States Supreme Court's decision in *Bates* v. *State Bar of Arizona* (1977) 433 U.S. 350 [53 L.Ed.2d 810, 97 S.Ct. 2691], (First Amendment protects attorney advertising of prices at which routine legal services will be performed), Slate & Leoni began sending letters to certain defendants regarding legal aspects of debt problems.

---

[2]The California Constitution declares: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." (Cal. Const., art. I, § 2, subd. (a).) We base the analysis equally on this provision, although throughout this opinion we will refer to the First Amendment to the United States Constitution which provides that "Congress shall make no law . . . abridging the freedom of speech."

[3]Slate was admitted to practice law in California on January 8, 1947.

[4]Leoni was admitted to practice law in California on June 19, 1946.

The letters informed the recipients of the procedural aspects of the case pending against them, as well as the legal rights and remedies of debtors. Slate & Leoni recommended that the recipient consult an attorney—his or her own or Slate & Leoni.

The recipients were defendants in small claims or municipal court actions or were owners of real properties which were in foreclosure. The names and addresses of the recipients were obtained by employees of Slate & Leoni at first and later by a private consulting firm using public records of judicial proceedings in the Los Angeles County courts and listings in public newspapers.

Between November 1978 and July of 1980, 83 different versions of the letters and informational enclosures were sent to approximately 250,000 recipients. The type of letter and enclosure received depended on the type of defendant (business or nonbusiness) and the procedural stage of the case against the defendant. Mailings were sent to defendants against whom: (1) civil complaints for money had been filed; (2) unlawful detainer actions had been filed;[5] (3) civil complaints for personal injury and property damage had been filed; (4) requests to enter default had been filed in collection actions; (5) writs of execution had been issued; and (6) writs of execution had been served. The letters did not identify the name or court number of the pending case. Instead, Slate & Leoni marked the letters with in-house filing numbers.

In addition to the letters, Slate & Leoni enclosed various informational pamphlets which were prepared by petitioner Slate. One letter, "Money Problems?" was included in virtually all of the correspondences. A second pamphlet, "How to Pay Debts Under Court Protection" was included in correspondences with individuals against whom civil complaints for money had been filed, requests to enter default in collection actions had been filed, and writs of execution had been issued or served. This pamphlet describes a chapter 13 bankruptcy, although the word "bankruptcy" is not mentioned in the pamphlet. In cases where a writ of execution had been issued against a defendant, a third enclosure, "What is a Writ of Execution?" was also included. A fourth enclosure, "If You Are in Business and You Are Facing A Writ of Execution," and a fifth enclosure, "Is Your Business Having Money Flow Problems?" were sent to business defendants against whom a writ of execution had issued. Additional enclosures included "Order for

---

[5]The letters to defendants in unlawful detainer actions were discontinued sometime around 1978 or 1979. In his deposition, petitioner Slate explained that this was done because the firm concluded that most defendants had personal, and not financial, disputes with their landlords.

Debt Relief," "The Consolidation Plan," and "How to Get a Release of a Garnishment on Your Pay-Check [*sic*]."

Slate & Leoni transmitted roughly 2,000 letters per month initially in 1978 and transmitted roughly 10,000 letters per month by 1980. The firm obtains at least one client for every 100 letters sent out and approximately 25 percent of the firm's chapter 13 (of the Bankruptcy Act) filings are attributable to the letter program. Chapter 13 cases reflect a portion, the extent of which is not clear from the record, of petitioners' law firm business. As the letters indicate, the lawyers will answer questions regarding the cases or mailings free of charge. Mr. Slate estimated that the office receives 5 or 6 callers per 100 letters whose questions are answered free of charge. Additionally, the enclosure "Money Problems, Lawsuits? Here are Some Suggestions" lists a telephone number where the recipient can call and listen to a recorded explanation of how a bankruptcy works. The parties stipulated that the letter program is designed, in part, to generate paying clients. Because the exclusive practice of the firm was in federal bankruptcy court, the firm would not charge a client unless there was an actual filing in the bankruptcy court. Additional services were performed without charge such as calls to negotiate with creditors and assistance with preparation of in pro. per. filings for state court proceedings.

There are numerous letters and enclosures in the record because Slate & Leoni revised their materials. For instance, the initial version of the enclosure "What is a Writ of Execution?" stated that "if you have $1,000 in a certain type of account in a *savings and loan association,* it cannot be seized by the officer." Because a husband and wife could not each have $1,000 in such an account, Slate & Leoni voluntarily changed the enclosure because they "wanted it to be exactly true and have nothing that might mislead somebody."

In January 1979, Mr. Slate wrote to the president of the State Bar of California outlining the letter program and enclosing samples of some of the letters which were actually sent. He requested that the State Bar undertake the letter program to provide information to persons who appear to be in need of legal assistance with their debt problems. The president thanked Mr. Slate for his letter and good intentions and forwarded the proposal to the Legal Services Division of the State Bar.

Two years later, on February 3, 1981, disciplinary proceedings were commenced by the State Bar on the complaint of members of the bar and the public concerning letters received.

## II. *State Bar Proceedings*

The disciplinary proceedings began with a notice to show cause which charged petitioners with willful violations of Rules 2-101 and 7-103. Five violations were alleged: (1) unlawful solicitation of business in violation of Rule 2-101(B);[6] (2) communication with parties represented by counsel on the subject of that representation in violation of Rule 7-103;[7] (3) use of untrue statements in violation of Rule 2-101(A)(1), use of statements, or arrangement of statements in a manner or format, which was false, deceptive, or tended to confuse, deceive or mislead the public in violation of Rule 2-101(A)(2), omission of necessary facts in violation of Rule 2-101(A)(3), and transmittal of communications in an objectionable manner in violation of Rule 2-101(A)(6).[8] The two remaining counts—interference with the administration of justice and misrepresentations to judicial officers—were dismissed by the State Bar examiners for lack of evidence.

At the proceeding before the Hearing Panel of the State Bar, the parties entered into a stipulation regarding the details of the letter program and the complaints received by the State Bar. Petitioner Slate was the only witness who actually testified. His deposition was also admitted into evidence.

Slate explained that internal filing numbers (and not the official court number) were printed on the letters so that the Slate & Leoni attorneys could

---

[6]Rule 2-101(B) states: "No solicitation or 'communication' seeking professional employment from a potential client for pecuniary gain shall be delivered by a member or a member's agent in person or by telephone to the potential client, nor shall a solicitation or 'communication' specifically directed to a particular potential client regarding that potential client's particular case or matter and seeking professional employment for pecuniary gain be delivered by any other means, unless the solicitation or 'communication' is protected from abridgement by the Constitution of the United States or by the Constitution of the State of California. A potential client includes a former or present client. [¶] Notwithstanding the foregoing, nothing in this subdivision (B) shall limit or negate the continuing professional duties of a member or a member's firm to former or present clients, or a member's right to respond to inquiries from potential clients."

[7]Rule 7-103 states: "A member of the State Bar shall not communicate directly or indirectly with a party whom he knows to be represented by counsel upon a subject of controversy, without the express consent of such counsel. This rule shall not apply to communications with a public officer, board, committee or body."

[8]Rule 2-101(A) states in part: "A 'communication' is a message concerning the availability for professional employment of a member or a member's firm. A 'communication' made by or on behalf of a member shall not:

"(1) Contain any untrue statement; or

"(2) Contain any matter, or present or arrange any matter in a manner or format, which is false, deceptive, or which tends to confuse, deceive or mislead the public; or

"(3) Omit to state any fact necessary to make the statements made, in the light of the circumstances under which they are made, not misleading to the public or

". . . . . . . . . . . . . . . . . . . . . .

"(6) Be transmitted in any manner which involves intrusion, coercion, duress, compulsion, intimidation, threats or vexatious or harassing conduct."

retrieve information about the case from their own files if a recipient called or came into the office. He also explained that the word "bankruptcy" was not used in the enclosures because he felt it was misleading. The public, Slate explained, usually thinks of a "straight" chapter 7 bankruptcy. Additionally, he noted that the word "bankruptcy" is not used in the new 1979 Bankruptcy Code. He further stated that he omitted the term because he did not want people to think the firm was pushing them into a bankruptcy when, in actuality, that is the last remedy the firm recommends. Finally, because the letters were sent at a time when few lawyers were familiar with the new Bankruptcy Code, Slate explained that one purpose of the letters was to inform the recipients' attorneys about chapter 13 proceedings. The citation to 11 United States Code section 1322 was included in the letters to assist the recipients' lawyers rather than the recipients.

The parties stipulated that seven complaints had been received and that there may be other instances involving similar facts. The hearing panel largely adopted the facts from the stipulation and concluded that the letters and enclosures were communications for the purpose of seeking professional employment for pecuniary gain in violation of Rule 2-101(B).

Findings as to the seven complaints were also made. One business recipient, Sitelines, Inc., is a California corporation wholly owned by a Delaware corporation, Guardian Industries. Sitelines was a defendant in a suit by its creditors and was represented by Mr. Greenberg, a California attorney. Judgment was entered against Sitelines and Greenberg determined that the corporation was judgment proof and so advised his client. In August 1980 Sitelines received petitioners' letter which referred to a chapter 13 bankruptcy, which is not available to corporations. Sitelines forwarded the letter to Guardian Industries whose officers determined that their assets could be attached. Contrary to Mr. Greenberg's advice, Guardian Industries paid the judgment. The hearing panel concluded that because Sitelines' or Guardian's assets could not be attached and because of the reference to chapter 13 bankruptcy, the letter contained material which was "false, deceptive, or which tended to confuse, deceive or mislead" in violation of Rule 2-101(A)(2). Because Greenberg appeared as attorney of record in the court file, the panel further concluded that petitioners communicated with a party whom they knew, or constructively knew, was represented by counsel upon a subject of controversy in violation of Rule 7-103.

A second attorney, Mr. Roman, was also provided with a copy of petitioners' letter by his client. The client, Ms. Russo, received the enclosure "Order for Debt Relief" which stated: "FILING FEE: The cash money that you need to apply for an ORDER FOR DEBT RELIEF is sixty dollars. This one filing fee protects both husband and wife." The attorney (but apparently not

the client) believed that the letter implied that the total cost of the service would be $60 and that the proposed plan referred to something other than a bankruptcy filing. When Mr. Roman called petitioners' office, an attorney explained that the plan could be a chapter 11 or 13 bankruptcy and that in addition to the $60 filing fee, 10 additional monthly payments for $60 would be charged. The hearing panel concluded that the letter and enclosures contained matter which was false, deceptive, or which tended to confuse, deceive or mislead because the service would not be provided for $60 and because the word "bankruptcy" was not disclosed by petitioners.

William Wagstaff was a defendant against whom a motion for summary judgment had been filed. His attorney, Mr. Jordan, filed an opposition to the motion. Prior to the hearing, Wagstaff received petitioners' letter which upset him and caused him to believe his attorney was not actively protecting his interests because he interpreted the letter to mean that he was a candidate for bankruptcy. The hearing panel found that petitioners communicated with a party represented by counsel in violation of Rule 7-103. They also found that the letter contained matter which was false or deceptive, or which tended to confuse, deceive or mislead, in violation of Rule 2-101 in that, contrary to the facts, the letter falsely suggested that the natural result of the civil action would be an adverse judgment and execution upon Wagstaff's assets.

Fidela Parayno was served with a summons and complaint for specific performance. She retained an attorney, Mr. Tarr, who filed an answer on her behalf. In February 1979, she received petitioners' letter and was placed in fear of imminent loss of personal property. She also questioned Mr. Tarr and he had to convince her that he was adequately protecting her interests. The hearing panel concluded that the letter was sent in violation of Rule 7-103 and that it was false, deceptive or tended to confuse, deceive or mislead in that it suggested that an adverse judgment would be rendered and Parayno's assets executed upon.

Jerrell Main was a defendant against whom a judgment of approximately $59,000 had been entered. In July 1980, he voluntarily paid $42,000 to his creditor pursuant to a stipulated payment schedule. In July 1980, he received petitioners' letter and enclosures which indicated that a writ of execution had issued against him. He became extremely upset. ▆▆▆ ▆ The hearing panel noted that plaintiffs never executed pursuant to a writ and none of Main's property was ever attached (but made no finding as to whether a writ had in fact issued).[9] They concluded that the letter contained

---

[9]As noted by the ACLU, the State Bar's findings are confusing. Apparently, a writ had in fact issued. As will be discussed more fully, this court may take judicial notice of matters in a civil action underlying the charges against an attorney in disciplinary proceedings (*Yokozeki* v. *State Bar* (1974) 11 Cal.3d 436, 444 [113 Cal.Rptr. 602, 521 P.2d 858]).

matter which was false or deceptive, or which tended to confuse, deceive or mislead in violation of Rule 2-101(A)(2). It was further found that the letter was transmitted in a manner involving intrusion or threats in violation of Rule 2-101(A)(6).

Valerie Sims was an employee of Norman Levine. At his request she rented an automobile for him and he subsequently refused to pay the charges. Sims was sued by the rental car company and decided to allow judgment to be entered against her and seek subrogation from Levine. Judgment was entered against her in February 1979. She sued Levine in February and settled the matter before trial. In March 1979, Sims received a letter which was mailed to her place of employment. Her new employer read the letter and became upset about the possibility of garnishment of wages. Sims telephoned petitioners and informed a secretary that the letter was inaccurate and that petitioners should not contact her because she considered the letter to be an invasion of privacy. A few weeks later, a second letter was sent to Sims' residence. Her husband saw the letter and became angry because he thought his wife had lied to him about the lawsuit. The hearing panel concluded that the letter contained matter which tended to confuse, deceive or mislead in violation of Rule 2-101(A)(2) and that the letter was transmitted in a matter involving intrusion, coercion, duress, compulsion, intimidation, threats or vexatious or harassing conduct in violation of Rule 2-101(A)(6).

Daisy of California, a California corporation, was sued and Daisy's attorney filed an answer in Los Angeles Municipal Court in May 1978. On November 28, 1978, the parties entered a stipulation in the court file, taking plaintiff's motion for default off calendar. Petitioners sent Daisy a letter, dated November 29, 1978, which Daisy's president interpreted as meaning that plaintiff was still seeking a default judgment and that something had occurred in the case of which he was unaware. The hearing panel concluded that the true status of the action was not as represented in the letter and the letter contained matter which was false or deceptive, or which tended to confuse, deceive or mislead in violation of Rule 2-101(A)(2).

The hearing panel recommended by a two-to-one vote that petitioners be suspended from practice for thirty days with execution of suspension stayed on the condition that petitioners certify that they had discontinued their letter program. The dissenting referee believed that public reproval was sufficient discipline. On rehearing, the discipline was reduced to public reproval by a two-to-one vote with the requirement that petitioners' letter program cease. No findings or conclusions were made on petitioners' claim that the letter program was protected by the First Amendment.

The Review Department of the State Bar Court adopted the findings of the hearing panel; however, it reached different legal conclusions. It dropped the Rule 2-103 charge of improper solicitation and the Rule 7-103 charges of improper communication with a party represented by counsel. It retained the conclusions of violations of Rule 2-101(A)(2) and (6).

The review department found four additional violations. It found that petitioners omitted necessary facts and violated Rule 2-101(A)(3) in two instances. First, the letters failed to state that the relief proposed required a filing under the Bankruptcy Act and second, the letters failed to state that such filing would require attorney's fees in addition to the $60 filing fee. The review department also found that petitioners violated Rule 2-101(A)(4) which prohibits communications which "[f]ail to indicate clearly, expressly or by context" that they are messages concerning the attorney's availability for professional employment. Finally, the review department found that the letter program, which involved up to 10,000 letters per month, involved a high probability for error and that the statements regarding the status of the case were added to inject an element of urgency to induce the recipient to the "desired action." Because of what the review department described as "almost inevitable inaccuracies" they found petitioners acted in reckless and willful disregard of their duties under Rule 2-101(A)(1), (2) and (3). Two of the three dissenting members of the review department expressed the view that the findings of fact were not supported by the evidence.

By an eight-to-five vote the review department recommended that petitioners be suspended from practice for 30 days with execution stayed and petitioners placed on probation upon certain conditions. Two of the five dissenting referees voted that petitioners' conduct was protected by the First Amendment. Two other dissenting referees voted that public reproval was sufficient discipline.

Petitioners contend that their letter program is entitled to the First Amendment protection accorded to noncommercial, and in the alternative to commercial, speech. ■■ ■■ ■■ ■■ The ACLU argues that the evidence is insufficient to support the findings of the State Bar and that because of procedural[10] defects the proceedings should be dismissed.

---

[10]The ACLU contends that petitioners did not receive notice of the alleged violations of Rule 2-101(A), subdivisions (1) and (4) specifically. This contention is without merit. Although due process requires that findings of violations be based on charges initially brought by the State Bar (see *In re Ruffalo* (1968) 390 U.S. 544, 551-552 [20 L.Ed.2d 117, 122-123, 88 S.Ct. 1222]; *Woodard* v. *State Bar* (1940) 16 Cal.2d 755, 757 [108 P.2d 407]), the notice to show cause charged petitioners with "wilfully violating Rules 2-101 and 7-103." This, in combination with the specific allegations in the nine-page notice gave petitioners ample notice of the violations.

III. *Analysis*

■ In analyzing the context- and content-based restrictions in the case at bench, we engage in a threshold inquiry: is petitioners' letter writing program commercial or noncommercial speech? Petitioners contend that their letters, in particular the informational enclosures, are within the category of noncommercial speech. If so, content-based restrictions are valid only in narrow and limited situations. (See, e.g., *Chaplinsky* v. *New Hampshire* (1942) 315 U.S. 568 [86 L.Ed. 1031, 62 S.Ct. 766] [fighting words]; *Miller* v. *California* (1973) 413 U.S. 15 [37 L.Ed.2d 419, 93 S.Ct. 2607] [obscenity]; *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2297] [libel].) With regard to solicitation by attorneys specifically, a " 'commonsense' distinction [has been made] between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation,[11] and other varieties of speech." (*Ohralik* v. *Ohio State Bar Association* (1978) 436 U.S. 447, 455-456 [56 L.Ed.2d 444, 453, 98 S.Ct. 1912].) (Compare *Ohralik* with *In re Primus* (1978) 436 U.S. 412 [56 L.Ed.2d 417, 98 S.Ct. 1893] and *NAACP* v. *Button* (1963) 371 U.S. 415 [9 L.Ed.2d 405, 83 S.Ct. 328].)

Petitioners assert that the massive letter campaign should be analyzed as noncommercial speech and place primary reliance on this court's opinion in *Jacoby* v. *State Bar* (1977) 19 Cal.3d 359 [138 Cal.Rptr. 77, 562 P.2d 1326, 4 A.L.R.4th 273], in which we addressed the issue of First Amendment limitations upon state regulation of attorney solicitation. Although the analysis in *Jacoby* is instructive, petitioners mischaracterize the holding as controlling in this case.

This court held in *Jacoby* that former Rule 2, a flat ban on solicitation of professional employment, "could not constitutionally be applied to prohibit an attorney from cooperating in the publication of a news article or broadcast on a newsworthy topic, even when the attorney himself is the subject." (*Id.*, at p. 363.) Petitioners argue that this court articulated the following test for differentiating between commercial and noncommercial speech: "A communication is not 'primarily directed' toward solicitation unless, viewed in its entirety, it serves no discernible purpose other than the attraction of clients. If a legitimate purpose appears on the face of a publication or in the

---

[11]That commercial speech is less protected than speech associated with core First Amendment concerns is illustrated by examining the overbreadth doctrine. Because of the heartier nature of commercial speech, the United States Supreme Court has declined to extend the overbreadth doctrine "to professional advertising, a context where it is not necessary to further its intended objective." (*Bates* v. *State Bar of Arizona* (1977) 433 U.S. 350, 381 [53 L.Ed.2d 810, 834, 97 S.Ct. 2691].) Because we conclude that the speech involved in this case is commercial, petitioners can only challenge the rules as applied to them.

demonstrated motivation of an attorney, the publication must receive at least prima facie First Amendment protection." (*Id.,* at p. 371.)

Petitioners' reliance is misplaced because as *Jacoby* involved an "as applied" challenge to a rule prohibiting all solicitation, the above quoted language articulated a test for generally determining the constitutional scope of former Rule 2's application. It did not articulate a test for determining when a message is entitled to the greater protection accorded noncommercial speech.[12]

The applicable analysis is set forth in *Bolger* v. *Youngs Drug Products* (1983) 463 U.S. 60 [77 L.Ed.2d 469, 103 S.Ct. 2875], which addresses the distinction between commercial and noncommercial speech and concludes that the unsolicited letter campaign constitutes commercial speech. Youngs Drug Products was a corporation engaged in the manufacture, sale and distribution of contraceptives. It sought to mail on an unsolicited basis flyers promoting products available at drug stores, flyers promoting prophylactics and informational pamphlets discussing the prevention of venereal disease and the desirability of prophylactics in general or Youngs' products in particular.

The United States Supreme Court held that the mailings, in particular the informational pamphlets, were properly classified as commercial speech. Three factors were examined, all of which were found to be present: (1) it was conceded that the pamphlets were advertisements; (2) the pamphlets referred to a specific product and (3) Youngs had an economic motive for mailing the information. (*Id.,* at pp. 66-68 [77 L.Ed.2d at pp. 477-478, 103 S.Ct. at pp. 2880-2881].)

The court noted that no one factor was determinative and that it was unnecessary for all three of the characteristics to be present in order for speech to be commercial. (*Id.,* at p. 67, fn. 14 [77 L.Ed.2d at p. 47, 103 S.Ct. at pp. 2880-2881].) In the case at bench, two of the factors are present. The letters refer to specific services offered by Slate & Leoni (assisting debtors in resolving their financial difficulties) and the firm had an economic motive in sending the letters. On the facts, the pamphlets and letters involved in *Bolger* and those sent by petitioners cannot be distinguished. All

---

[12]Given that the United States Supreme Court has recognized that business entities enjoy the full panoply of First Amendment protection for their direct comments on public issues (*Consolidated Edison Co.* v. *Public Service Commission* (1980) 447 U.S. 530 [65 L.Ed.2d 319, 100 S.Ct. 2326]) we note that it would be not only unnecessary but also contrary to the policy of consumer protection to adopt petitioners' position because it would "grant broad constitutional protection to any advertising that links a product to a current public debate." (*Central Hudson Gas & Electric Corp.* v. *Public Service Commission* (1980) 447 U.S. 557, at p. 563, fn. 5 [65 L.Ed.2d 341, 349, 100 S.Ct. 2343].)

are advertisements. We conclude, therefore, that petitioners' letter campaign must be analyzed pursuant to the commercial speech concepts.

## A. *Regulation of Commercial Speech*

■ The extension of First Amendment protection to commercial speech announced in *Va. Pharmacy Board* v. *Va. Consumer Council* (1976) 425 U.S. 748 [48 L.Ed.2d 346, 96 S.Ct. 1817] applies to regulation of advertising by lawyers. (*Zauderer* v. *Office of Disciplinary Counsel of the Supreme Court of Ohio* (1985) — U.S. — [85 L.Ed.2d 652, 105 S.Ct. 2265]; *In re R.M.J.* (1982) 455 U.S. 191 [71 L.Ed.2d 64, 102 S.Ct. 929]; *Bates* v. *State Bar of Arizona* (1977) 433 U.S. 350 [53 L.Ed.2d 810, 97 S.Ct. 2691].) Lawyers are permitted to advertise the availability and terms of routine legal services (*Bates, supra,* at p. 384 [53 L.Ed.2d at p. 836]), to advertise by general mailings of announcement cards and to include in their advertisements lists of jurisdictions where they are licensed to practice and areas of specialization. (*In re R.M.J., supra,* at pp. 205-206 [71 L.Ed.2d at pp. 75-76].)

■ The State Bar does not argue that commercial speech is without First Amendment protection, but contends that the Slate & Leoni letters and pamphlets are misleading. Therefore the State Bar argues, it may invoke Rule 2-101(A)'s permissible content-based restriction.

We agree and note that the First Amendment cases do not question the authority of the state to regulate misleading advertising. In *Va. Pharmacy Board* v. *Va. Consumer Council* (1976) 425 U.S. 748 [48 L.Ed.2d 346, 96 S.Ct. 1817], the Supreme Court held that a ban on advertisements of prices of prescription drugs violated the First Amendment. In rejecting the argument that commercial speech was without First Amendment protection the court stated that "[i]f there is a kind of commercial speech that lacks all First Amendment protection, therefore, it must be distinguished by its content." (*Id.,* at p. 761 [48 L.Ed.2d at p. 358].) The court specifically recognized that misleading advertising could be regulated, noting that "[o]bviously, much commercial speech is not probably false, or even wholly false, but only deceptive or misleading. We foresee no obstacle to a state's dealing effectively with this problem." (*Id.,* at p. 771 [48 L.Ed.2d at p. 364].)

The principle that "[a]dvertising that is false, deceptive, or misleading . . . is subject to restraint" has been repeatedly affirmed in the commercial speech cases. (*Zauderer, supra,* — U.S. at p. — [85 L.Ed.2d at pp. 667-668, 105 S.Ct. at p. 2278]; *Bates, supra,* 433 U.S. at p. 383 [53 L.Ed.2d at p. 835].) The United States Supreme Court has stated the principle in

broad terms: "The government may ban forms of communication more likely to deceive the public than to inform it [citations] or commercial speech related to illegal activity. [Citation.]" (*Central Hudson Gas & Electric Corp.* v. *Public Service Commission of New York* (1980) 447 U.S. 557 at pp. 563-564 [65 L.Ed.2d 341 at p. 349, 100 S.Ct. 2343].) In analyzing restrictions on commercial speech the Supreme Court has stated "At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading." (*Id.,* at p. 566 [65 L.Ed.2d at p. 351].) Limitations on an absolute ban, however, have been indicated. "Misleading advertising may be prohibited entirely . . . [but] the States may not place an absolute prohibition on certain types of potentially misleading information, *e.g.,* a listing of areas of practice, if the information also may be presented in a way that is not deceptive." (*In re R.M.J., supra,* 455 U.S. at p. 203 [71 L.Ed.2d at p. 74].)

Further, it has been noted that special considerations apply to advertising by lawyers because they "do not dispense standardized products; they render professional services of almost infinite variety and nature, with the consequent enhanced possibility for confusion and deception if they were to undertake certain kinds of advertising." (*Va. Pharmacy Board* v. *Va. Consumer Council* (1976) 425 U.S. 748, 773, fn. 25 [48 L.Ed.2d 346, 365, 96 S.Ct. 1817].) This court analyzed the above quoted language in *Jacoby* v. *State Bar* (1977) 19 Cal.3d 359 [138 Cal.Rptr. 77, 562 P.2d 1326, 4 A.L.R.4th 273]. Writing for the court, Justice Mosk explained that the footnote "stands for the proposition that while the First Amendment values in commercial advertising remain constant regardless of the profession involved, the governmental regulatory interest may vary from profession to profession." (*Id.,* at p. 377.)

### B. *Validity of Rule 2-101(A)*

 Having determined that the state may prohibit misleading advertising, we turn to the specific question presented: May the State Bar prohibit the advertising campaign of letters and informational pamphlets which explain the status of the recipients' cases and debtors' legal rights and remedies?

 As noted by the State Bar, an attorney seeking review of the review department's recommendation has the burden of demonstrating that the findings are not supported by substantial evidence or that the recommendation is erroneous or unlawful. (Bus. & Prof. Code, § 6083, subd. (c); *Dixon* v. *State Bar* (1982) 32 Cal.3d 728 [187 Cal.Rptr. 30, 653 P.2d 321].) "In meeting this burden, the petitioner must demonstrate that the charges of

unprofessional conduct are not sustained by convincing proof and to a reasonable certainty." (*Himmel* v. *State Bar* (1971) 4 Cal.3d 786, 794 [94 Cal.Rptr. 825, 484 P.2d 993].)

■ Applying these well established principles to the case at bench we conclude that Rule 2-101(A) is a permissible regulation of misleading advertising. We further conclude that petitioners' massive advertising campaign which particularizes letters to the facts of the recipients' cases is misleading. In analyzing the letters, we are guided by the policy of consumer protection and examine the standard for misleading advertising as stated in Business and Professions Code sections 17200 and 17500 because of the statute's similarity to Rule 2-101.

Rule 2-101(A) is permissible because it regulates misleading advertising. That rule prohibits messages only if they (1) concern the availability for professional employment and (2) contain statements which are untrue, deceptive, which tend to confuse, deceive or mislead the public. This is virtually identical in scope to the prohibition contained in Business and Professions Code sections 17200 and 17500. Those sections prohibit "unfair, deceptive or misleading advertising" and have been interpreted broadly to embrace not only advertising which is false, but also advertising which although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public. (*Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 211 [197 Cal.Rptr. 783, 673 P.2d 660]; *Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 876 [127 Cal.Rptr. 110, 544 P.2d 1310]; *People* ex rel. *Mosk* v. *Lynam* (1967) 253 Cal.App.2d 959, 966 [61 Cal.Rptr. 800]; 64 Ops.Cal.Atty.Gen. 782, 787 (1981).)

Rule 2-101(A) is also similar to the general consumer protection provisions of the Business and Professions Code, because an attorney may only be disciplined for willful breach of Rule 2-101(A) (or any of the Rules of Professional Conduct). (Bus. & Prof. Code, § 6077.) ■ To establish willful breach it must be shown that the attorney acted purposely, that he knew what he was doing and that he intended to commit the act. Knowledge of the Rules is not an element of the offense. (*Abeles* v. *State Bar* (1973) 9 Cal.3d 603, 610 [108 Cal.Rptr. 359, 510 P.2d 719]; *Zitny* v. *State Bar* (1966) 64 Cal.2d 787, 792 [51 Cal.Rptr. 825, 415 P.2d 521].) ■ Similarly, the general advertising regulations of the Business and Professions Code may be violated even where there is no *specific* intent to deceive or mislead. (*Chern* v. *Bank of America, supra,* 15 Cal.3d at p. 876.)

■ Having determined that Rule 2-101(A) permissibly regulates misleading advertising, we ask whether the rule is constitutional as applied to

petitioners and conclude that the letters have a likelihood of misleading the public and actually did mislead members of the public. This massive advertising campaign that seemed to personalize letters to individuals named as defendants in pending lawsuits was almost certain to cause panic and to mislead the recipients. For example, the letter sent to defendants against whom a complaint for specific performance had been filed (e.g., letter to F. Parayno), is misleading in that it suggests that an adverse judgment is imminent and that the recipient's personal assets will be attached as a result of that judgment.

■ As for the violation of Rule 2-101(A)(3) (omission of facts necessary to make material not misleading), we conclude that a violation occurred because the letters state that the recipients need $60 cash to apply for debt relief but fail to state that Slate & Leoni will also charge 10 times that amount in attorney fees. A necessary fact has been omitted and the rule violated.

■ We also conclude that the State Bar's finding of a violation of Rule 2-101(A)(4), failure to clearly identify the message as a communication for employment, is supported by the evidence. Although the letter can be interpreted by lawyers as indicating that it is a message concerning the firm's availability for professional employment, it does not clearly state that it is such. A "clear" indication to laypersons that a message concerns availability for professional employment is required and the rule could easily be satisfied by a statement such as "This is an advertisement."

■ The finding that the format in which petitioners presented their message involved intrusion, threats, intimidation, harassment or duress in violation of Rule 2-101(A)(6) is also supported by the record. Although transmission of commercial speech by mail appears to be entitled to constitutional protection and is not considered a significant intrusion on privacy (see *Bolger* v. *Youngs Drug Products* (1983) 463 U.S. 60 at pp. 71-72 [77 L.Ed.2d 469 at pp. 480-481, 103 S.Ct. 2875 at p. 2883]; *In re R.M.J.* (1982) 455 U.S. 191, 206, fn. 20 [71 L.Ed.2d 64, 76, 102 S.Ct. 929]; *Consolidated Edison Co.* v. *Public Serv. Comm'n* (1980) 447 U.S. 530, 541-542 [65 L.Ed.2d 319, 330-331, 100 S.Ct. 2326]), the particularized, misleading and unsolicited letters mailed to defendants against whom cases were then pending were bound to cause panic and fear in the lay recipients.

■ Finally, we reverse the finding that the petitioners violated Rule 2-101(A)(1) (untrue statements). Although statements in the letters may be misleading none of the letters contain false or untrue statements. The State Bar's findings suggest that the letter to Jerrell Main falsely stated that a writ of execution had issued. This was not a false statement; a writ of execution

had issued against Main, a development of which he was unaware until receipt of the Slate & Leoni letter. This court may take judicial notice of such records where those proceedings are a basis for disciplinary action. (*Yokozeki* v. *State Bar* (1974) 11 Cal.3d 436, 444 [113 Cal.Rptr. 602, 521 P.2d 858]; see fn. 10, *ante.*) The evidence does not support a finding that petitioners violated Rule 2-101(A)(1).

 Guided by the policy of consumer protection against misleading advertising, we conclude that Rule 2-101(A)'s regulation of misleading advertising is constitutional on its face and as applied to petitioners' case. We note, however, that the rule cannot constitutionally be invoked to totally prohibit all future mass advertising which, due to disclaimers or clarifying language, is not false or misleading. We hope that the State Bar will assist its members in acting in accordance with the Rule rather than, as in the instant case, only initiating disciplinary proceedings. Although we strongly disapprove of petitioners' deceptive method of generating additional clientele, we find the 30 days' suspension recommended by the board to be excessive. The fact that petitioners have no prior disciplinary record is a factor in their favor (see *Mrakich* v. *State Bar* (1973) 8 Cal.3d 896, 907 [106 Cal.Rptr. 497, 506 P.2d 633]), as is the fact that petitioners made good faith efforts to modify the letters so as to make them truthful and not misleading. With these considerations in mind, we are satisfied that a public reprimand will constitute sufficient discipline. This reprimand is to inform petitioners that their individualized advertising campaign does violate Rule 2-101(A) and that the rule is constitutional on its face. This opinion shall serve as such reprimand.

**BIRD, C. J.,** Concurring and Dissenting.—I agree with Justice Grodin that an attorney may not be disciplined for conduct—or for omissions—which he or she could not reasonably foresee would be found to violate a rule. I write to observe that two other violations upheld by the majority fall within this category.

First, petitioners could scarcely have anticipated that it would be necessary to spell out that they charge fees for legal representation in order to avoid a rule 2-101(A)(3) violation. (See maj. opn., *ante,* at p. 627.) Few, if any, lay persons are likely to assume that lawyers work free of charge. Though Russo's attorney claimed he believed that the $60 filing fee would cover attorneys' fees, evidently Russo herself was not so naive. (*Id.,* at p. 618.)

Second, the majority chastise petitioners for failing to identify their letters clearly as communications for employment. I agree that the letters could have been clearer about the scope of petitioners' practice and their avail-

ability for employment. Yet, the majority's solution—that the letters say "this is an advertisement"—is not one which petitioners could have divined from the rules. Rule 2-101(A)(4) allows attorneys to "indicate clearly, *expressly or by context*" that their communications concern availability for professional employment. The context of these letters, written on law firm stationery and inviting the recipient to call for a free initial consultation, must have suggested strongly to most lay persons that petitioners were available for employment after that consultation.[1]

Furthermore, the majority's proposed message is no improvement. It is more misleading than the letter which was actually sent out. Petitioners were *not* available for employment in the state court proceedings in which the letter recipients were involved. Their practice was exclusively federal.

The majority's affirmance of these two unforeseeable "violations," I submit, will not motivate the State Bar to clarify its rules either through the adoption of standards under rule 2-101(D) or through advisory opinions. (Conc. and dis. opn. of Grodin, J., *post* at p. 630.) On the contrary, it suggests that such standards and opinions are unnecessary. I would urge the State Bar and the court to tread carefully in this area of constitutionally protected speech. Violations should be found only when it is clear that an attorney must reasonably have known that his conduct would lead to such a result.

**GRODIN, J.,** Concurring and Dissenting.—The philosopher-lawyer Jeremy Bentham characterized as "dog law" a system in which a person has no way of knowing that he is doing something wrong until he is punished for it.

I agree that rule 2-101(A), insofar as its application is called into question here, is valid on its face as a permissible means of protecting the public against false or misleading communications, or especially intrusive communications, by members of the State Bar seeking professional employment. The rule is broadly phrased, however, and reasonable people can differ as to its application in a particular case. Because communications by attorneys to prospective clients are within the ambit of the First Amendment (*In re R.M.J.* (1982) 455 U.S. 191 [71 L.Ed.2d 64, 102 S.Ct. 929]; *Matter of*

---

[1] The finding concerning rule 2-101(A)(4) suffers from a procedural flaw as well. Though the majority claims otherwise (maj. opn., *ante,* at p. 621, fn. 10), I cannot find any allegation in the notice of violation that petitioners were charged with violating this rule. On the contrary, that notice refers repeatedly to the letters as "communications regarding availability for employment" or as "solicitations" without ever suggesting that the letters might have been viewed otherwise by their recipients.

Even the State Bar's trial brief failed to mention this alleged violation. It would be impossible to deduce from the notice or from the brief that the letters "[f]ail[ed] to indicate clearly, expressly or by context, that [they were] 'communication[s].'" (Rule 2-101(A)(4).)

*Koffler* (1980) 51 N.Y.2d 140 [432 N.Y.S.2d 872, 412 N.E.2d 927]) and because rule 2-101(A), like other rules of professional conduct, is enforced through disciplinary proceedings which may lead to sanctions ranging from reproval to disbarment, the potential for the sort of "dog law" that transgresses upon constitutional principles is particularly acute.

The situation is analogous to the imposition of civil penalties (as distinguished from injunctive relief) for false or deceptive advertising (Bus. & Prof. Code, § 17500 et seq.). In *People* v. *Superior Court (Olson)* (1979) 96 Cal.App.3d 181, 195 [157 Cal.Rptr. 628], the Court of Appeal, rejecting a requirement that the People prove knowledge of falsity or reckless disregard of the truth, held that the imposition of civil monetary penalties for the *negligent* dissemination of untruthful or misleading advertising does not offend the First Amendment. The court implied that a strict liability principle would be constitutionally objectionable.

I would hold that an attorney violates rule 2-101(A) only when he knows, or reasonably should know, that his communication is in violation of that rule. Such a standard should impose no undue burden upon the State Bar. It should, on the other hand, motivate the State Bar to adopt additional standards for the implementation of rule 2-101(A), as contemplated by the rules themselves.[1] It should also motivate the State Bar to provide some procedure for advising attorneys who are in genuine doubt as to whether their communication would violate the rules. (See *Matter of Koffler, supra,* 432 N.Y.S.2d at p. 878.)

In this case, I agree with the majority that petitioners should have been aware that their mass mailing campaign, in the form of letters which purported to give particularized information to recipients engaged in litigation, would invariably mislead some,[2] and on that ground I concur in the finding

---

[1]Rule 2-101(D) provides in part: "The Board of Governors of the State Bar shall formulate and adopt standards as to what 'communications' will be presumed to violate subdivisions (A) or (B) of this rule 2-101." The standards which have been adopted to date declare a presumption of violation in communications which contain guarantees, warranties, or predictions regarding the result of legal action or testimonials about or endorsements of a member; communications delivered in person or by telephone to a potential client who is in such a physical, emotional or mental state that he or she would not be expected to exercise reasonable judgment as to the retention of counsel; and communications transmitted at the scene of an accident or at or en route to a hospital, emergency care center or other health care facility.

[2]The letters to Sitelines, whose attorney had determined that it was judgment proof, and to Main, who had been making stipulated payments on the judgment taken against him, stated: "This creditor, who holds the judgment against you, has taken one more step, that maybe you do not know about. A writ of execution has been issued by the Court. This is a Court order, ordering the Sheriff to levy on your assets." While possibly accurate in the abstract, it was not so in either of these cases. It implied that the recipients' assets would

that petitioners violated rule 2-101(A)(2). I concur also with respect to the other violations except for the asserted violation of rule 2-101(A)(6), which prohibits transmission of communications "in any manner which involves intrusion, coercion, duress, compulsion, intimidation, threats or vexatious or harassing conduct." It seems quite clear from the language of the rule, as well as from the standards which the State Bar Board of Governors has adopted (see fn. 1, *ante*), that the rule is directed to the time, place, and manner of the communication rather than to its substance. Consequently, I do not believe that communication by mail can be said to violate that rule. In *Matter of Koffler, supra,* 432 N.Y.S.2d 872, the New York Court of Appeals rejected the bar association's claim that it was necessary to prohibit mail solicitations in order to protect privacy and prevent "overbearing persuasion." The court held that these factors "which could conceivably be present in telephone solicitation . . . are not sufficiently possible in mail solicitation to justify banning it. As the Supreme Court put it in *Consolidated Edison* v. *Public Serv. Comm.* (447 U.S. 530, 542-543), a recipient of a lawyer's letter 'may escape exposure to objectionable material simply by transferring . . . [it] from envelope to wastebasket.' It is not enough to justify a ban that in some situations . . . a solicitation letter may be offensive to the recipient, or that some people may fear receiving a lawyer's letter . . . ." I agree.

**KAUS, J.,** Concurring and Dissenting.—I agree fully with the majority opinion, except as to one minor point: I do not think petitioners were charged with facts which would constitute a violation of rule 2-101(A)(4), nor do I believe that such a violation was proven. It seems to me that petitioners' communications fairly trumpet their availability for professional employment.

---

be seized, and failed to note that such seizure would occur only if the creditor asked the sheriff to execute the writ. Officers of the corporation were misled to the actual injury of the corporation, and Main was understandably upset by the implication that notwithstanding his compliance with the stipulation the creditor was about to seize his assets.

The letter to Wagstaff, whose attorney had opposed the creditor-plaintiff's summary judgment motion, recited that the plaintiff had asked the court "to order judgment against you. After judgment is ordered, the next step is to have the Court issue a writ of execution against you. This is a Court order, ordering the Marshall or Sheriff to levy on your assets, car, paycheck, bank account, etc. [¶] We recommend this problem be taken care of right away, before you are hit with a judgment." The clear implication of the language was that unless the recipient took some unspecified action beyond that which his attorney had taken, a judgment would be entered against him and his assets seized.

The letters to Parayno, whose attorney had filed an answer to the creditor's complaint, used the same language and conveyed the same implication. In the Sims case the language was the same. In that case, since judgment had been taken, and the record does not reflect that it had been paid, the inaccuracy was minor, but the implication that her assets were in danger of seizure was not.

This minor difference of opinion in no way affects my agreement with the discipline imposed.

Petitioners' application for a rehearing was denied September 25, 1985. Bird, C. J., and Grodin, J., were of the opinion that the application should be granted.