[No. B179653. Second Dist., Div. Five. Oct. 30, 2006.]

THE U.D. REGISTRY, INC., Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA et al., Defendants and Appellants.

[No. B186012. Second Dist., Div. Five. Oct. 30, 2006.]

THE U.D. REGISTRY, INC., Plaintiff and Respondent, v.
THE STATE OF CALIFORNIA et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part IV.

COUNSEL

Jacobson, Russell, Saltz & Fingerman, Michael J. Saltz, Keri Rochelle Montrose and Mark E. Fingerman for Plaintiff and Appellant and for Plaintiff and Respondent.

Bill Lockyer, Attorney General, Albert N. Shelden, Assistant Attorney General, Ronald A. Reiter, Susan Henrichsen and Robyn C. Smith, Deputy Attorneys General, for Defendants and Appellants.

OPINION

TURNER, P. J.—

## I. INTRODUCTION

Plaintiff, the U.D. Registry, Inc., and defendants, the State of California and Attorney General Bill Lockyer, appeal from a September 9, 2004 judgment. Defendants separately appeal from an April 13, 2005 postjudgment order awarding plaintiff attorney fees. Plaintiff is a credit reporting agency that provides consumer credit reports to landowners who rent and lease apartments and to property managers. Plaintiff sought declaratory relief and to enjoin enforcement of Civil Code[1] section 1785.11.2 on federal and state constitutional free speech grounds. Section 1785.11.2 is known as the "security freeze" law; it allows California consumers to prevent the dissemination of their credit reports. Plaintiff argues section 1785.11.2 violates its First Amendment right to disseminate consumer credit reports containing truthful, lawfully obtained information; much of it secured from federal and state court records. The trial court ruled the security freeze law was unconstitutional with respect to information included in the consumer credit reports that

---

[1] All further statutory references are to the Civil Code except where otherwise noted.

is culled from public records. The trial court's injunction only enjoined defendants from enforcing section 1785.11.2 as to information contained in "and/or" obtained from matters of public record. Otherwise, apart from public record information, section 1785.11.2 remained in full force and effect. We conclude that section 1785.11.2 is unconstitutional as applied to plaintiff who, the agreed facts prove, provides credit reports drawn in material part from public records including court documents. And we find section 1785.11.2 cannot be judicially reformed. In this regard, plaintiff is entitled to prevail on its constitutional claims on an as-applied basis. But we do not believe section 1785.11.2 is invalid in its entirety and thus part company with plaintiff in this regard. We reverse the judgment and direct entry of an injunction against defendants insofar as they attempt to enforce section 1785.11.2 against plaintiff. We also reverse the judgment insofar as it barred enforcement of section 1785.11.2 against any other party. In the unpublished portion of the opinion, we affirm the attorney fee award.

## II. BACKGROUND

### A. Plaintiff's Declaratory and Injunctive Relief Action

Plaintiff is a credit reporting agency that issues consumer credit reports within the meaning of section 1785.3, subdivisions (c)[2] and (d)[3] of the Consumer Credit Reporting Agencies Act (the act). (§ 1785.2 et seq.) Plaintiff collects credit-related public record information about individuals including unlawful detainer, foreclosure, bankruptcy, and tax lien data. Plaintiff sells consumer credit reports to its members—landowners, property managers, and others. Plaintiff's members consider the reports in deciding whether to lease real property to prospective tenants. The members agree in advance not to use the reports for any other purpose nor to disclose the information contained therein to others. Plaintiff's database includes records "on tens of millions of prospective tenants" in California and several other states. Plaintiff also resells credit reports from the three major credit reporting agencies in the United States—TransUnion, Experian, and Equifax; those reports include

---

[2] Section 1785.3, subdivision (c) defines a consumer credit report as follows: " 'Consumer credit report' means any written, oral, or other communication of any information by a consumer credit reporting agency bearing on a consumer's credit worthiness, credit standing, or credit capacity, which is used or is expected to be used, or collected in whole or in part, for the purpose of serving as a factor in establishing the consumer's eligibility for: (1) credit to be used primarily for personal, family, or household purposes, or (2) employment purposes, or (3) hiring of a dwelling unit, . . . or (4) other purposes . . . ."

[3] Section 1785.3, subdivision (d) defines a consumer credit reporting agency as: " 'Consumer credit reporting agency' means any person who, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the business of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer credit reports to third parties, but does not include any governmental agency whose records are maintained primarily for traffic safety, law enforcement, or licensing purposes."

identifying information and employment and credit histories. The stipulated facts stated: "In order to assist landlords, property [managers] and others determining the eligibility of a consumer for hiring real property, [plaintiff] maintains a database of various real estate related public records. These public records consist of: unlawful detainer court cases, judicial foreclosure cases, non-judicial foreclosures, federal bankruptcy cases, federal and state tax liens from the County Recorder's office, criminal court matters and other federal and state civil court cases related to real estate issues. [Plaintiff] maintains these public records on tens of millions of prospective tenants throughout the state of California and several other states." The stipulated facts also state: "In addition . . . , such reports also include identification information; a record of inquiries (all who have asked for the consumer's report in the last year, or last two years if for employment purposes); a summary of the information contained in credit reports obtained by [plaintiff] from Trans Union, Experian, and/or Equifax; and an unabridged report on all reported credit activity. Credit reports obtained from Trans Union, Experian, and/or Equifax typically include identification and employment information and credit history, including creditor's name, payment history and nature and limit of credit."

Plaintiff's Web site advertised that customers were provided an "Eviction/Tenancy Report" which contains: an "Eviction Case Search"; a "Foreclosure Search" which includes judicial foreclosure of mortgages and liens and trustee and bank foreclosures; a "Bankruptcy Search" which consists of bankruptcy petitions filed in federal court; information as to whether the applicant has been an "Arrieta Claimant" or previously involved with one; a "residence history" which involves a person who has been evicted; tenant history supplied by prior landlords; existing arrest warrants; whether an applicant has a history as a vexatious litigant; a full unabridged report of all reported credit history; compilation of all reported civil judgments; a complete list of all tax liens; reported collection agency activity; and out-of-state credit history. Also, the Web site explains a detailed demographic profile presumably for rental applicants will be prepared which includes: addresses; past addresses; Social Security numbers; verification of Social Security numbers; employers; wage and occupation; age; and birth dates. According to the stipulated facts, in order to change its computer system so as to comply with section 1785.11.2, plaintiff would incur in excess of $50,000 in costs.

Plaintiff commenced this declaratory and injunctive relief action against defendants on December 19, 2002. Plaintiff sought an injunction against enforcement of section 1785.11.2. Plaintiff also requested a declaration that: "[section 1785.11.2] violates the First and Fourteenth Amendments of the [United States Constitution] and Article 1, Sections 2 [free speech] and 7 [equal protection] of the California Constitution and [is], therefore, null and

void; plaintiff is not required to comply with its terms and provisions"; and the "State of California, and Attorney General, Bill Lockyer[,] be enjoined from enforcing [section 1785.11.2] against [p]laintiff and others similarly situated." As can be noted, the complaint seeks a generalized determination section 1785.11.2 is unconstitutional (a facial challenge) and a request defendants be enjoined from enforcing section 1785.11.2 against plaintiff (an as-applied challenge).

After the trial based on the foregoing stipulated facts, the trial court ruled: "1. The operation of California Civil Code Section 1785.11.2 ('Freeze Statute') is permanently enjoined to the extent that the Freeze Statute seeks to prevent the dissemination and reporting by consumer credit reporting agencies of any information contained in and/or obtained from matters of public record, and to the extent that it seeks to preclude [p]laintiff from disseminating and reporting information contained in the public record; [¶] 2. Defendants and all persons in active concert and participation with them be, and hereby are, permanently enjoined from enforcing the Freeze Statute to the extent that the Freeze Statute seeks to prevent the dissemination and reporting by consumer credit reporting agencies of any information contained in and/or obtained from matters of public record, and to the extent that the Freeze Statute seeks to preclude [p]laintiff from disseminating and reporting information contained in the public record; [¶] 3. The Freeze Statute violates both the First Amendment to the United States Constitution and Article I Section 2 of the California Constitution and is generally overbroad and violates equal protection to the extent that the Freeze Statute seeks to prevent the dissemination and reporting by consumer credit reporting agencies of information contained in and/or obtained from matters of public record, and to the extent that the Freeze Statute seeks to preclude [p]laintiff from reporting information contained in the public record; [¶] 4. Plaintiff is not required to comply with the Freeze Statute to the extent that the Freeze Statute seeks to preclude [p]laintiff from reporting any information contained in and/or obtained from matters of public record. [¶] Objections overruled." As can be noted, the trial court made two determinations. The trial court ordered defendants not to enforce section 1785.11.2. But the judgment also enjoined enforcement of section 1785.11.2 against plaintiff. As will be noted, we uphold the injunction against the enforcement of section 1785.11.2 as to plaintiff. But as to the generalized injunction against enforcement of section 1785.11.2 as to anybody else, we reverse the injunctive order.

## B. The Security Freeze Law, Section 1785.11.2

Section 1785.11.2 is part of the act. (§ 1785.2 et seq.) The stated intent of the act is to regulate credit reporting agencies in order to protect California consumers. The Legislature declared the purpose of the act as follows: "(a) An elaborate mechanism has been developed for investigating and evaluating

the credit worthiness, credit standing, credit capacity, and general reputation of consumers. [¶] (b) Consumer credit reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers. [¶] (c) There is a need to insure that consumer credit reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy. [¶] (d) It is the purpose of this title to require that consumer credit reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, hiring of a dwelling unit, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this title. [¶] (e) The Legislature hereby intends to regulate consumer credit reporting agencies pursuant to this title in a manner which will best protect the interests of the people of the State of California." (§ 1785.1.)

Section 1785.11.2 provides in part: "(a) A consumer may elect to place a security freeze on his or her credit report by making a request in writing by certified mail to a consumer credit reporting agency. 'Security freeze' means a notice placed in a consumer's credit report, at the request of the consumer and subject to certain exceptions, that prohibits the consumer credit reporting agency from releasing the consumer's credit report or any information from it without the express authorization of the consumer. If a security freeze is in place, information from a consumer's credit report may not be released to a third party without prior express authorization from the consumer. This subdivision does not prevent a consumer credit reporting agency from advising a third party that a security freeze is in effect with respect to the consumer's credit report."

Section 1785.11.2 was enacted as part of legislation intended to protect consumers from identity theft. (Sen. Judiciary Com., Rep. on Sen. Bill No. 168 (2001–2002 Reg. Sess.) as amended Apr. 16, 2001, p. 1; Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 168 (2001–2002 Reg. Sess.) as amended Sept. 12, 2001, p. 1.) Section 1785.11.2 was intended to address the identity theft problem in three principal ways: allowing consumers to place fraud alerts on their credit reports; permitting them to prevent or control the release of their credit reports; and prohibiting specified government and business uses of Social Security numbers. (Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 168 (2001–2002 Reg. Sess.) as amended Sept. 12, 2001, p. 1.)

The bill's author, Senator Debra Bowen, argued that identity theft, including the unauthorized use of Social Security numbers, was on the rise. The Assembly Committee on the Judiciary reported: "According to consumer advocates, criminals assume the identity of about 350,000 people a year. The term 'identity theft' refers to the practice of scam artists who fraudulently

obtain credit, loans, long distance phone service, etc. in another person's name. This is accomplished through a variety of means including, assumption of identification, theft of identifying information such as Social Security numbers, [personal identification number (PIN)] codes, and through fraudulent changes of address. Often the innocent party does not know that he or she has been the victim of fraud, until he or she applies for, and is denied, credit. [¶] Application fraud, as it is known to the credit and banking industry, is a growing problem for businesses as well. The American Bankers Association reports that in 1995, application fraud accounted for 13 percent of all fraud. MasterCard reports that in 1995, it lost $28.3 million to application fraud. This is up almost 10 percent from just the year before, and the trend is growing. According to the [United States] General Accounting Office, credit card application fraud losses totaled $745 million in 1997. [¶] In California, law enforcement agencies report this crime is exacting an increasing toll on police resources. According to the author's office, the [Los Angeles Police Department (LAPD)] receives between 150 and 200 [identity] theft cases per month, and the LAPD's identity theft caseload has doubled from 1,600 in 1998 to more than 3,000 in 1999. And, in 1999, the telephone hotline at the Social Security Administration received reports of almost 39,000 incidents of misuse of Social Security numbers. The author's office also notes that the Social Security Administration conducted 1,153 Social Security number misuse investigations in 1997 compared to only 305 in 1996." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 168 (2001–2002 Reg. Sess.) as amended July 5, 2001, pp. 5–6; Sen. 3d reading analysis of Sen. Bill No. 168 (2001–2002 Reg. Sess.) as amended Sept. 12, 2001, p. 3.) A Senate analysis observed, "It can take identity theft victims several years to clear their credit records, during which time many victims have trouble establishing new credit, renting apartments and getting jobs because many applications require a credit check as part of the approval process." (Sen. 3d reading analysis of Sen. Bill No. 168 (2001–2002 Reg. Sess.) as amended Sept. 12, 2001, p. 3.)

Consumers Union, which supported the legislation, explained the need for and effect of the security freeze provision as follows: "While California has taken important steps over the past several years to aid victims of identity theft, prevention is the most effective way to stop this problem. [Senate Bill No.] 168 does this by helping to ensure that people obtaining credit are who they say they are. This bill would allow a consumer to put a freeze on any release of . . . credit information unless the consumer affirmatively allows its release. When issuing new credit, a credit grantor checks the credit history of the consumer. If a consumer believes that he or she is the victim of identity theft, the consumer can prevent the release of the credit information. If the information is not released, the identity thief will not be able to establish credit in the consumer's name." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 168 (2001–2002 Reg. Sess.) as amended July 5, 2001, pp. 7–8.)

The legislative reports reflect concern about the use of Social Security numbers in credit reports. Analyses of the bill noted that Social Security numbers are included in a credit report's "header" information, along with a consumer's name and address. According to a Senate Judiciary Committee report, the "header" information, which involves Social Security numbers, can be sold by credit bureaus. (Sen. Judiciary Com., Rep. on Sen. Bill No. 168 (2001–2002 Reg. Sess.) as amended Apr. 16, 2001, p. 1.) The Senate Judiciary Committee report stated that existing laws governing credit reporting agencies did not address the issue of access to Social Security numbers. (*Id.* at p. 2.) According to the Senate Judiciary Committee report: "The author states that, although state and federal credit reporting laws place limits on a credit reporting agency's ability to share or sell personal information from credit reports, the laws do not prohibit the sale of 'header information' from a report, including a consumer's name, address, telephone number, and [Social Security number]. [¶] . . . [¶] Due to the widespread use and perceived reliability of [Social Security numbers], their unauthorized use is the most common and successful means by which identity thieves establish credit in someone else's name." (*Id.* at pp. 4–5; see also Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 168 (2001–2002 Reg. Sess.) as amended Sept. 12, 2001, p. 7.)

Senate Bill No. 168 (2001–2002 Reg. Sess.) was also intended in part to shift some of the identity theft burden from consumers to credit reporting agencies and other entities. The California Public Interest Research Group argued in support of the bill: "Right now the burden is completely on consumers to both protect their personal information and clean up their damaged credit reports once they have become victims of identity theft. Unfortunately, a consumer has little control over who has access to his Social Security number and credit report, so his actions will not necessarily prevent identity theft from occurring. It is the responsibility of the business or other entity [that] profits from the distribution of a consumer's personal information to keep that information from falling into the wrong hands. [Senate Bill No.] 168 will help place the responsibility where it belongs." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 168 (2001–2002 Reg. Sess.) as amended July 5, 2001, pp. 8–9.) The Senate Judiciary Committee Report discussed, "Who should bear the cost of privacy protection? [¶] The existence and widespread use of credit reports, as well as government reliance on [Social Security numbers] for many purposes, are facts of modern life that consumers cannot prevent. If these unavoidable facts of life pose threats to individual privacy and financial security, the question becomes how best to protect individual privacy, and who should pay for such protection. [¶] This bill's security alert and freeze provisions, and the provisions restricting [Social Security number] use, appear to keep the costs of privacy protection off of consumers, who have little choice in the matter, and to assign them to the entities who either benefit from their access to private information (credit

reporting agencies) or those whose use of [Social Security numbers] is convenient but not necessary (companies using [Social Security numbers] as identifiers for recordkeeping purposes)." (Sen. Judiciary Com., Rep. on Sen. Bill No. 168 (2001–2002 Reg. Sess.) as amended Apr. 16, 2001, p. 8, underscoring omitted.) In a similar vein, the Assembly Committee on Banking and Finance commented: "This bill is a matter of equity and protection of one's good name and reputation. . . . [¶] This bill attempts to address the issue of the risk of financial loss being inadequately shared by those who benefit from the collection and dissemination of personal information, financial and otherwise. The issues involve the balancing of rights and obligations between business and consumers in credit transactions. . . . [¶] . . . [¶] . . . After [identity theft] occurs the victim consumer is faced with a mountain of difficulties and expense on the path to restoration of his/her credit reputation. In proportion to assets the expenses faced by the victim are far greater than those faced by credit agency or credit grantor." (Assem. Com. on Banking and Finance, Analysis of Sen. Bill No. 168 (2001–2002 Reg. Sess.) as amended June 14, 2001, pp. 2–3.)

It is also evident a consumer's right to *control* the use of his or her personal and financial information was a legislative concern. The Assembly Committee on Banking and Finance noted that credit reporting agencies gather and transmit personal information about consumers—which can "result in disastrous consequences for the individual" when an identity thief strikes— "outside of the purview of the affected person." (Assem. Com on Banking and Finance, Analysis of Sen. Bill No. 168 (2001–2002 Reg. Sess.) as amended June 14, 2001, p. 3.) The Assembly Committee on the Judiciary identified as a key issue whether consumers should be permitted to assert control over the use of their personal and financial information. (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 168 (2001–2002 Reg. Sess.) as amended July 5, 2001, p. 1.) The Assembly Committee on the Judiciary's synopsis of the bill explained the parameters of the permitted control: "The bill also permits a consumer to place a security freeze on his or her credit report which would prohibit the credit reporting agency from releasing the consumer's credit report or any information from it without the express authorization of the consumer. A consumer, using a personal identification number assigned to him or her by the credit reporting agency, would be able to lift the freeze and allow his or her credit report to be accessed for a specific purpose, party or period of time, provided that specified information is presented to the credit bureau." (*Id.* at p. 1.) Proponents of the legislation expressed a desire to place control of credit reports in the hands of the consumer: "Supporters of the bill argue that . . . the bill's security alert and security freeze provisions are necessary to give the consumer, rather than the credit grantor or credit bureau, control over the use of his or her credit history." (*Id.* at p. 2.) Consumers Union, a supporter, asserted in part, "[Senate Bill No.] 168 gives the consumer, rather than the credit grantor or

credit bureau, control over the use of his or her credit history. Because information in credit reports is about a consumer, the consumer's right to control distribution of that report should be a fundamental one." (*Id.* at p. 8.)

## III. DISCUSSION

### A. The Constitutionality of the Security Freeze Law Under the First Amendment as Applied to Plaintiff

#### 1. Basic Principles

■ Plaintiff argues its dissemination of public record facts and other credit-related information is speech that is protected by the federal and state Constitutions, and section 1785.11.2 is a content-based regulation that violates plaintiff's First Amendment free speech right. Plaintiff relies on the free speech provisions of both the federal and state Constitutions. The First Amendment to the United States Constitution which is applicable to the states through the Fourteenth Amendment due process clause guarantees " 'Congress shall make no law . . . abridging the freedom of speech . . . .' " (*McIntyre v. Ohio Elections Comm'n* (1995) 514 U.S. 334, 336, fn. 1 [131 L.Ed.2d 426, 115 S.Ct. 1511], italics omitted; see *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 951 [119 Cal.Rptr.2d 296, 45 P.3d 243].) The United States Supreme Court has extended First Amendment protection to commercial speech. (*Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60, 64 [77 L.Ed.2d 469, 103 S.Ct. 2875] (*Bolger*); *Va. Pharmacy Bd. v. Va. Consumer Council* (1976) 425 U.S. 748, 758–770 [48 L.Ed.2d 346, 96 S.Ct. 1817]; *Bigelow v. Virginia* (1975) 421 U.S. 809, 818 [44 L.Ed.2d 600, 95 S.Ct. 2222].) But the First Amendment protection extends only to commercial speech that is truthful, concerns lawful activity, and is not misleading. (*Central Hudson Gas & Elec. v. Public Serv. Comm'n* (1980) 447 U.S. 557, 566 [65 L.Ed.2d 341, 100 S.Ct. 2343] (*Central Hudson*); *Va. Pharmacy Bd. v. Va. Consumer Council, supra,* 425 U.S. at p. 771 ["Untruthful speech, commercial or otherwise, has never been protected for its own sake"].) Article I, section 2, subdivision (a) of the California Constitutions states: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." ■ This state constitutional free speech provision is at least as broad as the federal Constitution's First Amendment. (*Kasky v. Nike, Inc., supra,* 27 Cal.4th at pp. 958–959; *Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 490 [101 Cal.Rptr.2d 470, 12 P.3d 720].) Truthful, nonmisleading speech about lawful products and services is protected under the California Constitution. (*Kasky v. Nike, Inc., supra,* 27 Cal.4th at p. 959; *Gerawan Farming, Inc. v. Lyons, supra,* 24 Cal.4th at p. 493.) The line between commercial and noncommercial speech under

the state Constitution is the same as that drawn under the federal Constitution. (*Kasky v. Nike, Inc., supra,* 27 Cal.4th at p. 959; see *Leoni v. State Bar* (1985) 39 Cal.3d 609, 614, fn. 2, 623–624 [217 Cal.Rptr. 423, 704 P.2d 183]; *ARP Pharmacy Services, Inc. v. Gallagher Bassett Services, Inc.* (2006) 138 Cal.App.4th 1307, 1314 [42 Cal.Rptr.3d 256].) There is no separate test for commercial speech under the state Constitution. (*Kasky v. Nike, Inc., supra,* 27 Cal.4th at p. 969; see *Leoni v. State Bar, supra,* 39 Cal.3d at p. 614 & fn. 2.)

■ The burden is on the state to demonstrate the constitutionality of section 1785.11.2. (*United States v. Playboy Entertainment Group, Inc.* (2000) 529 U.S. 803, 816–817 [146 L.Ed.2d 865, 120 S.Ct. 1878]; *Greater New Orleans Broadcasting Assn., Inc. v. United States* (1999) 527 U.S. 173, 183 [144 L.Ed.2d 161, 119 S.Ct. 1923].) The United States Supreme Court has held: "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions. [Citations.] When the Government seeks to restrict speech based on its content, the usual presumption of constitutionality afforded congressional enactments is reversed. 'Content-based regulations are presumptively invalid,' *R.A.V. v. St. Paul,* 505 U.S. 377, 382 [120 L.Ed.2d 305, 112 S.Ct. 2538] (1992), and the Government bears the burden to rebut that presumption." (*United States v. Playboy Entertainment Group, Inc., supra,* 529 U.S. at pp. 816–817.) Whether section 1785.11.2 is unconstitutional is a question of law and our review is de novo. (*Valov v. Department of Motor Vehicles* (2005) 132 Cal.App.4th 1113, 1120 [34 Cal.Rptr.3d 174]; *People v. Health Laboratories of North America, Inc.* (2001) 87 Cal.App.4th 442, 445 [104 Cal.Rptr.2d 618].)

■ Before proceeding to an analysis of the First Amendment issues, it is appropriate to review the two types of applicable constitutional challenges—facial and as-applied attacks on a statute. Our Supreme Court delineated the scope of an as-applied challenge thusly: "An as applied challenge may seek (1) relief from a specific application of a facially valid statute or ordinance to an individual or class of individuals who are under allegedly impermissible present restraint or disability as a result of the manner or circumstances in which the statute or ordinance has been applied, or (2) an injunction against future application of the statute or ordinance in the allegedly impermissible manner it is shown to have been applied in the past. It contemplates analysis of the facts of a particular case or cases to determine the circumstances in which the statute or ordinance has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right. [Citations.]" (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145]; see *California Assn. of Private Special Education Schools v. California Department of Education* (2006) 141 Cal.App.4th 360, 376 [45 Cal.Rptr.3d 888].) As-applied challenges are evaluated on a case-by-case basis. (*Tobe v.*

*City of Santa Ana, supra,* 9 Cal.4th at p. 1084; *Hale v. Morgan* (1978) 22 Cal.3d 388, 404 [149 Cal.Rptr. 375, 584 P.2d 512].) Finally, an as-applied challenge requires evidence that the statute is or has been applied in an unconstitutional manner in the past. (*Bowen v. Kendrick* (1988) 487 U.S. 589, 621 [101 L.Ed.2d 520, 108 S.Ct. 2562]; *Tobe v. City of Santa Ana, supra,* 9 Cal.4th at p. 1084.) As part of the agreed facts, the parties do not dispute that section 1785.11.2 requires plaintiff to freeze the release of information derived from public documents.

■ By contrast, a facial challenge is conducted as follows: "A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual. [Citation.] ' "To support a determination of facial unconstitutionality, voiding the statute as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute . . . . Rather, petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." ' (*Arcadia Unified School Dist. v. State Dept. of Education* (1992) 2 Cal.4th 251, 267 [5 Cal.Rptr.2d 545, 825 P.2d 438], quoting *Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 180–181 [172 Cal.Rptr. 487, 624 P.2d 1215].)" (*Tobe v. City of Santa Ana, supra,* 9 Cal.4th at p. 1084, original italics.)

## 2. The applicable level of constitutional scrutiny: commercial versus noncommercial speech

The first question we must consider is what type of speech is at issue. Plaintiff asserts the expression at issue is noncommercial speech and relies on *U.D. Registry, Inc. v. State of California* (1995) 34 Cal.App.4th 107, 111 [40 Cal.Rptr.2d 228], a decision of our colleagues in Division Four of this appellate district. In *U.D. Registry,* our Division Four colleagues evaluated the constitutionality of former section 1785.13, subdivision (a)(3) which stated: "(a) Except as authorized under subdivision (b) no consumer credit reporting agency shall make any consumer credit report containing any of the following items of information: [¶] . . . [¶] (3) Unlawful detainer actions, unless the lessor was the prevailing party. For purposes of this paragraph, the lessor shall be deemed to be the prevailing party only if (A) final judgment was awarded to the lessor (i) upon entry of the tenant's default, (ii) upon the granting of the lessor's motion for summary judgment, or (iii) following trial, or (B) the action was resolved by a written settlement agreement between the parties which states that the unlawful detainer action may be reported. In any other instance in which the action is resolved by settlement agreement, the lessor shall not be deemed to be the prevailing party for purposes of this

paragraph." (Stats. 1991, ch. 1145, § 1.1, p. 5527.) Our Division Four colleagues held former section 1785.13, subdivision (a)(3) did not involve an issue of commercial speech. Our colleagues addressed the commercial speech issue as follows: "The test for identifying commercial speech is whether the expression at issue proposes a commercial transaction. (*Va. Pharmacy Bd. v. Va. Consumer Council, supra,* 425 U.S. 748, 762; *Spiritual Psychic Science Church v. City of Azusa* (1985) 39 Cal.3d 501, 510–511 [217 Cal.Rptr. 225, 703 P.2d 1119] [disapproved on another point in *Kasky v. Nike, Inc., supra,* 27 Cal.4th at p. 968].) Applying this settled definition, it is clear that the expression in this case, truthful information taken from public records regarding unlawful detainer defendants, does not propose a commercial transaction, and hence is not commercial speech. The fact that UDR sells the information does not transform it to commercial speech any more than the fact that a magazine or newspaper is sold makes its contents commercial speech. 'Some of our most valued forms of fully protected speech are uttered for a profit.' (*Board of Trustees, State Univ. of N.Y. v. Fox* [(1989)] 492 U.S. [469,] 482 [106 L.Ed.2d 388, 109 S.Ct. 3028].)" (*U.D. Registry, Inc. v. State of California, supra,* 34 Cal.App.4th at p. 111, fn. omitted.)

Defendants argue though that the foregoing bright-line rule—that commercial speech is only that which proposes a transaction—in *U.D. Registry, Inc. v. State of California, supra,* 34 Cal.App.4th at page 111, has been superseded by subsequent authority. We agree with defendants the "speech proposing a commercial transaction" test is no longer the sole test for determining the purposes. The controlling discussion in this regard is the analysis of our Supreme Court in *Kasky v. Nike, supra,* 27 Cal.4th at page 957, an opinion issued after *U.D. Registry, Inc.* In *Kasky,* our Supreme Court explained the United States Supreme Court has held that the propose-a-commercial-transaction test for commercial speech is not the *sole* standard of First Amendment review. In *Kasky,* the California Supreme Court explained that in *Board of Trustees, State Univ. of N.Y. v. Fox, supra,* 492 U.S. at pages 473–474, the United States Supreme Court held that " ' "speech proposing a commercial transaction" ' " was *the test* for identifying commercial speech. But as our Supreme Court explained in *Kasky,* "[I]n other decisions the [United States Supreme C]ourt has indicated that the category of commercial speech is not limited to this core segment. For example, the [United States Supreme C]ourt has accepted as commercial speech a statement of alcohol content on the label of a beer bottle (*Rubin v. Coors Brewing Co.* [(1995)] 514 U.S. [476,] 481–482 [131 L.Ed.2d 532, 115 S.Ct. 1585]), as well as statements on an attorney's letterhead and business cards identifying the attorney as a CPA (certified public accountant) and CFP (certified financial planner) (*Ibanez v. Florida Dept. of Business and Professional Regulation, Bd. of Accountancy* [(1994)] 512 U.S. [136,] 142)." (*Kasky v. Nike, Inc., supra,* 27 Cal.4th at p. 956; see *Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1381 [1

Cal.Rptr.3d 32, 71 P.3d 296] ["there is no bright-line distinction between commercial and noncommercial speech"].)

Later in *Kasky*, our Supreme Court identified various tests applied in the advertising context by the United States Supreme Court. Yet, as our Supreme Court explained in *Kasky*, those standards are not the exclusive test for identifying commercial speech: "Thus, although the court in *Bolger*[ *v. Youngs Drugs Products Corp.* (1983)] 463 U.S. 60 [77 L.Ed.2d 469, 103 S.Ct. 2875], identified three factors—advertising format, product references, and commercial motivation—that in combination supported a characterization of commercial speech in that case, the court not only rejected the notion that any of these factors is *sufficient* by itself, but it also declined to hold that all of these factors in combination, or any one of them individually, is *necessary* to support a commercial speech characterization." (*Kasky v. Nike, Inc., supra*, 27 Cal.4th at p. 957, original italics.)

Finally, in *Kasky*, our Supreme Court cited United States Supreme Court decisional language which acknowledged ambiguities exist " 'at the margins' " of what may be categorized as commercial speech. (*Kasky v. Nike, Inc., supra*, 27 Cal.4th at p. 958, citing *Edenfield v. Fane* (1993) 507 U.S. 761, 765 [123 L.Ed.2d 543, 113 S.Ct. 1792]; see also *Cincinnati v. Discovery Network, Inc.* (1993) 507 U.S. 410, 419–420 [123 L.Ed.2d 99, 113 S.Ct. 1505]; *Zauderer v. Office of Disciplinary Counsel of Supreme Court* (1985) 471 U.S. 626, 637 [85 L.Ed.2d 652, 105 S.Ct. 2265, 17 Ohio B. 315].) Therefore, we agree with defendants the analysis in *U.D. Registry, Inc. v. State of California, supra*, 34 Cal.App.4th at page 111 that "[t]he test" for defining commercial speech is whether the expression proposes a commercial transaction is no longer the sole standard of First Amendment review. As our Supreme Court has noted, there is no single bright-line test for defining commercial speech. (*Intel Corp. v. Hamidi, supra*, 30 Cal.4th at p. 1381; *Kasky v. Nike, Inc., supra*, 27 Cal.4th at p. 956.)

Commercial speech is entitled to less First Amendment protection than other forms of expression. (*Bolger, supra*, 463 U.S. at pp. 64–65; *Kasky v. Nike, Inc., supra*, 27 Cal.4th at p. 952.) As to noncommercial speech, content-based regulation is valid only when it is narrowly tailored, i.e., the least restrictive means is used to promote a compelling government interest. (*United States v. Playboy Entertainment Group, Inc., supra*, 529 U.S. at p. 813; *Kasky v. Nike, Inc., supra*, 27 Cal.4th at p. 952.) Other forms of speech receive no First Amendment protection at all—for example, "fighting words" or extortion. (*Bigelow v. Virginia, supra*, 421 U.S. at p. 819 [fighting words]; *Flatley v. Mauro* (2006) 39 Cal.4th 299, 328 [46 Cal.Rptr.3d 606, 139 P.3d 2] [extortion].) Commercial speech though is subject to an intermediate standard of review first set forth in *Central Hudson, supra*, 447 U.S. at page 566: "At the outset, we must determine whether the expression is protected by the First Amendment.

For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." (See *Kasky v. Nike, Inc., supra,* 27 Cal.4th at p. 952.) We will assume for purposes of discussion that plaintiff's credit reports are commercial speech and apply the *Central Hudson* test. We recognize a strong argument can be made that the applicable rule is the speech proposing a commercial transaction test utilized by our Division Four colleagues in *U.D. Registry, Inc. v. State of California, supra,* 34 Cal.App.4th at pages 111–116. But the as-applied aspect of this case is resolvable with appropriate judicial certainty utilizing the *Central Hudson* test. If the constitutionality of section 1785.11.2 can be decided on the least controversial grounds—the *Central Hudson* test—it is more judicious to resolve the as-applied issue on that basis so that plaintiff can exercise its free expression and free press rights and the Legislature can address the identity theft issue with a more precisely drafted statute. Additionally, we note other courts have treated credit reports as commercial speech. (*Trans Union Corp. v. F.T.C.* (D.C. Cir. 2001) 345 U.S. App.D.C. 301 [245 F.3d 809, 818–819]; *Millstone v. O'Hanlon Reports, Inc.* (8th Cir. 1976) 528 F.2d 829, 832–833; *Hood v. Dun & Bradstreet, Inc.* (5th Cir. 1973) 486 F.2d 25, 30; *Individual Reference Services Group v. F.T.C.* (D.C. 2001) 145 F.Supp.2d 6, 40–41.)

### 3. The *Central Hudson* Test Applicable to Commercial Speech

The United States Supreme Court set forth the four-part intermediate scrutiny analysis applicable to content-based regulation of commercial speech in *Central Hudson, supra,* 447 U.S. at page 566 (the *Central Hudson* test): "At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." (Accord, *Lorillard Tobacco Co. v. Reilly* (2001) 533 U.S. 525, 554–555 [150 L.Ed.2d 532, 121 S.Ct. 2404] [refusing to reject *Central Hudson* analysis].)

Our conclusions concerning the *Central Hudson* test are as follows. First, we must determine whether the speech concerns lawful activity and is not misleading. (*Central Hudson, supra,* 447 U.S. at p. 566; *ARP Pharmacy Services, Inc. v. Gallagher Bassett Services, Inc., supra,* 138 Cal.App.4th at

p. 1316.) It is undisputed plaintiff's consumer credit reports neither relate to unlawful activity nor are misleading. Plaintiff's reports contain credit related information about individuals culled from public sources including unlawful detainer, foreclosure, bankruptcy, and tax lien records. Of material consequence is that court records of the type utilized by plaintiff are presumptively open for public examination. (*NBC Subsidiary (KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1217–1218 [86 Cal.Rptr.2d 778, 980 P.2d 337]; *In re Marriage of Burkle* (2006) 135 Cal.App.4th 1045, 1051–1052 [37 Cal.Rptr.3d 805].) In addition, plaintiff republishes information in credit reports obtained from TransUnion, Experian, and Equifax. These reports benefit consumers by facilitating the extension of credit. They benefit lessors by identifying potential lessees who are bad credit risks. Therefore, although plaintiff's interest in disseminating the reports is pecuniary, consumers also benefit. Plaintiff's truthful credit reports lawfully obtained from public records, thus are controlled by the first prong of the *Central Hudson* analysis.

Second, we must consider whether the asserted government interest is substantial. (*Central Hudson, supra*, 447 U.S. at p. 566; *ARP Pharmacy Services, Inc. v. Gallagher Bassett Services, Inc., supra*, 138 Cal.App.4th at p. 1316.) Here, the Legislature's stated goals were to: protect consumers from identity theft; give the public a tool to prevent identity theft; and in general prevent further identity theft. In support of their assertion this interest is substantial, defendants point to statistics cited in the legislative committee reports evidencing the rise in identity theft. Law enforcement and other agencies reported increases in the numbers of identity theft inquiries, complaints, and investigations. Plaintiff does not dispute that protecting consumers from identity theft is a substantial government interest. Indeed, in the trial court and here, the parties conceded protecting consumers from identity theft is a compelling state interest. This court previously has observed, "Nor can it be seriously doubted that our state has a compelling interest in protecting its citizens against fraud and identity theft. [Citation.]" (*Valov v. Department of Motor Vehicles, supra*, 132 Cal.App.4th at p. 1128.) Similarly, the United States Supreme Court has recognized a substantial state interest in preventing fraud and protecting privacy. (*Edenfield v. Fane, supra*, 507 U.S. at pp. 768–769; *Schaumburg v. Citizens for Better Environ.* (1980) 444 U.S. 620, 636 [63 L.Ed.2d 73, 100 S.Ct. 826].) We conclude the government interest is substantial and compelling.

Third, we turn to the question whether section 1785.11.2 directly and materially advances the government's asserted interest in protecting consumers from identity theft. (*Greater New Orleans Broadcasting Assn., Inc. v. United States, supra*, 527 U.S. at p. 188; *Central Hudson, supra*, 447 U.S. at p. 566.) The Supreme Court has described this third aspect of the *Central Hudson* test thusly: "The third part of the *Central Hudson* test asks whether the speech restriction directly and materially advances the asserted

governmental interest. 'This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.' *Edenfield*[ *v. Fane, supra,* 507 U.S. at pp.] 770–771. Consequently, 'the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose.' *Central Hudson,* 447 U.S., at 564. We have observed that 'this requirement is critical; otherwise, "a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression." ' *Rubin*[ *v. Coors Brewing Co.* (1995)] 514 U.S. [476,] 487, quoting *Edenfield,* 507 U.S., at 771." (*Greater New Orleans Broadcasting Assn., Inc. v. United States, supra,* 527 U.S. at p. 188.) The legislative committee reports include statements to the effect that an identity thief may be less likely to obtain credit in the victim's name when the creditor cannot access a credit report; therefore, a consumer may be able to thwart identity theft by freezing dissemination of his or her credit report. Defendants did not present any specific evidence to that effect in the trial court. More precisely, there is no evidence a single credit report prepared by plaintiff has led to a single case of identity theft. Nevertheless, we will assume, for purposes of discussion, that section 1785.11.2 directly advances the government's interest in protecting consumers from identity theft by allowing them to stop the distribution of their credit reports.

■ Fourth, the restriction must not be excessive. (*Central Hudson, supra,* 447 U.S. at pp. 564, 566; *Kasky v. Nike, Inc., supra,* 27 Cal.4th at p. 952.) The United States Supreme Court has held, "[I]f the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive." (*Central Hudson, supra,* 447 U.S. at p. 564; see *Board of Trustees, State Univ. of N.Y. v. Fox, supra,* 492 U.S. at p. 480.) ■ Section 1785.11.2 contains "excessive restrictions" within the meaning of the *Central Hudson* test. Section 1785.11.2 includes plaintiff's truthful reporting of lawfully available and obtained public record information. Section 1785.11.2 prevents disclosure of data contained in court records which are constitutionally presumptively available to journalists and the public. (*NBC Subsidiary (KNBC-TV), Inc. v. Superior Court, supra,* 20 Cal.4th at pp. 1217–1218; *Huffy Corp. v. Superior Court* (2003) 112 Cal.App.4th 97, 104 [4 Cal.Rptr.3d 823].) Defendants do not dispute that section 1785.11.2 prevents plaintiff from disseminating information about unlawful detainer, bankruptcy, tax lien, foreclosure, and other public proceedings against individuals; all of it secured from public records. The bulk of the sources of records referred to on plaintiff's Web site are publicly produced documents. Nor do defendants dispute the public nature of that information; it is available to members of the public without resort to plaintiff's reports. Moreover, preventing plaintiff from disseminating *all* of the public record information does not serve the asserted state interest. The knowledge that an individual

has been the subject of an unlawful detainer action by a lessor, a tax lien imposed by the government, or a foreclosure action by a lender does not facilitate identity theft. Even if that information could be of some use to a potential identity thief, it would be available without resort to plaintiff's credit reports. Nor is it likely the absence of such records, without more, would result in an extension of consumer credit to a would-be thief. We conclude section 1785.11.2 sweeps more broadly than is necessary to serve the government interest in protecting consumers from identity theft; therefore, "the excessive restriction[] cannot survive." (*Central Hudson, supra,* 447 U.S. at p. 564.) The state has not demonstrated that as applied to plaintiff's consumer credit reports containing public record information, the ban on dissemination advances its asserted interest in preventing identity theft.

As discussed above, section 1785.11.2 does not survive the intermediate scrutiny applicable to commercial speech as applied to plaintiff. Therefore, section 1785.11.2 does not, if the expression at issue is noncommercial speech, survive the strict scrutiny standard applicable to noncommercial speech. Hence, even if plaintiff's consumer credit reports are noncommercial speech because they do not propose a commercial transaction (*City of Cincinnati v. Discovery Network, Inc., supra,* 507 U.S. at pp. 422–423; *Board of Trustees of State University of N.Y. v. Fox, supra,* 492 U.S. at pp. 473–474; *Bolger, supra,* 463 U.S. at p. 66)—as our Division Four colleagues held in *U.D. Registry, Inc. v. State of California, supra,* 34 Cal.App.4th at page 111—section 1785.11.2 unconstitutionally violates plaintiff's First Amendment rights. As discussed above, section 1785.11.2 is more extensive than is necessary to serve the state's asserted interest. It follows, as pertinent to a strict scrutiny analysis, that section 1785.11.2 is not narrowly tailored to promote that interest; it is not the least restrictive means to that end. (*United States v. Playboy Entertainment Group, Inc., supra,* 529 U.S. at p. 813; *Kasky v. Nike, Inc., supra,* 27 Cal.4th at p. 952.) Under any relevant First Amendment analysis, section 1785.11.2 is unconstitutional as applied to plaintiff.

## B. Reformation

As noted above, the trial court enjoined the operation and enforcement of section 1785.11.2 to the extent it prevents dissemination and reporting of "any information contained in and/or obtained from matters of public record" as to plaintiff but otherwise allowed the statute to stand. Plaintiff argues that section 1785.11.2 cannot be judicially reformed. The California Supreme Court has set forth the applicable rule as follows: "This court has refused to undertake wholesale judicial amendment of legislation. [Citations.] However, 'a reviewing court may, in appropriate circumstances, and consistently with the separation of powers doctrine, reform a statute to conform it to constitutional requirements in lieu of simply declaring it

unconstitutional and unenforceable.' [Citation.] '[W]herever possible, [this court] will interpret a statute as consistent with applicable constitutional provisions, seeking to harmonize Constitution and statute. [Citations.]' [Citation.] This is because this court '[is] bound, if possible, to construe a statute in a fashion that renders it constitutional.' [Citation.]" (*Prof'l Eng'rs v. Dep't of Transp.* (1997) 15 Cal.4th 543, 596 [63 Cal.Rptr.2d 467, 936 P.2d 473]; see *Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 615–616 [47 Cal.Rptr.2d 108, 905 P.2d 1248] (plur. opn. of Lucas, C. J.).) Relying on former Chief Justice Lucas's plurality opinion in *Kopp*, our colleague, Associate Justice Paul Boland of Division Eight of this appellate district, explained: " '[A] court may reform—i.e., "rewrite"—a statute in order to preserve it against invalidation under the Constitution, when we can say with confidence that (i) it is possible to reform the statute in a manner that closely effectuates policy judgments clearly articulated by the enacting body, and (ii) the enacting body would have preferred the reformed construction to invalidation of the statute.' " (*In re Marriage of Burkle, supra*, 135 Cal.App.4th at p. 1068, citing *Kopp v. Fair Pol. Practices Com., supra*, 11 Cal.4th at pp. 660–661.)

In *Metromedia, Inc. v. City of San Diego* (1981) 453 U.S. 490, 521 [69 L.Ed.2d 800, 101 S.Ct. 2882] (plur. opn. of White, J.), the United States Supreme Court reversed the decision of the California Supreme Court in *Metromedia, Inc. v. San Diego* (1980) 26 Cal.3d 848, 885–886 [164 Cal.Rptr. 510, 610 P.2d 407], concerning the validity under the First Amendment on restrictions on off-site advertising signs. The United States Supreme Court remanded the case to our Supreme Court in order to determine whether the ordinance could be reformed. (*Metromedia, Inc. v. San Diego, supra*, 453 U.S. at p. 521 & fn. 26.) Upon remand, in *Metromedia, Inc. v. City of San Diego* (1982) 32 Cal.3d 180, 190–191 [185 Cal.Rptr. 260, 649 P.2d 902], our Supreme Court declined to reform an ordinance restricting off-site advertising signs. Our Supreme Court held that the ordinance could not be reformed because: it was doubtful whether the purpose of the original ordinance could be served by a reformed version; as reformed, the language of the ordinance was inconsistent with that of the original enactment; there was insufficient evidence there would be a material reduction in the number of billboards; as reformed, the city would be left with an ordinance less effective in achieving the goal of reducing the number of billboards; and there would be constitutional problems discerning what was commercial as distinguished from noncommercial speech. (*Metromedia, Inc. v. City of San Diego, supra*, 32 Cal.3d at pp. 190–191.)

Similarly, in the case of *In re Marriage of Burkle, supra*, 135 Cal.App.4th at pages 1068–1069, Division Eight of this appellate district held Family Code

section 2024.6[4] was invalid on its face and could not be reformed. Our Division Eight colleagues held that Family Code section 2024.6 was invalid because: the First Amendment provides a qualified right of access to court records in marital dissolution litigation; the privacy interests protected by Family Code section 2024.6 could justify sealing of marital dissolution litigation documents; but the statute was not narrowly tailored to serve such a potentially overriding interest; and therefore, Family Code section 2024.6 operated as an undue burden on the First Amendment right of access to documents filed in court proceedings. (135 Cal.App.4th at p. 1048.) One of the litigants sought to rewrite that portion of Family Code section 2024.6, subdivision (a) which states "the court shall order a pleading that lists the parties' financial assets and liabilities and provides the location or identifying information about those assets and liabilities sealed" to say " 'the court shall order that part of a pleading . . . sealed' " which refers to assets and liabilities. (135 Cal.App.4th at pp. 1067–1068, italics omitted.) Associate Justice Boland explained in some detail why Family Code section 2024.6, subdivision (a) could not be reformed because: the sine qua non of the statute envisioned streamlined proceedings, sealing of an entire document, not merely specified financial information; the proposed sealing of specified financial information would redact not only the identity of the asset, to prevent theft, but would also shield from public view its value; to only modify the statute to seal specified information would preserve the improper burden on journalists and the public to show good cause to unseal the financial data which contravenes the constitutional qualified right of access; and to place the burden of justifying

---

[4] Family Code section 2024.6 states in its entirety: "(a) Upon request by a party to a petition for dissolution of marriage, nullity of marriage, or legal separation, the court shall order a pleading that lists the parties' financial assets and liabilities and provides the location or identifying information about those assets and liabilities sealed. The request may be made by ex parte application. Nothing sealed pursuant to this section may be unsealed except upon petition to the court and good cause shown. [¶] (b) Commencing not later than July 1, 2005, the Judicial Council form used to declare assets and liabilities of the parties in a proceeding for dissolution of marriage, nullity of marriage, or legal separation of the parties shall require the party filing the form to state whether the declaration contains identifying information on the assets and liabilities listed therein. If the party making the request uses a pleading other than the Judicial Council form, the pleading shall exhibit a notice on the front page, in bold capital letters, that the pleading lists and identifies financial information and is therefore subject to this section. [¶] (c) For purposes of this section, 'pleading' means a document that sets forth or declares the parties' assets and liabilities, income and expenses, a marital settlement agreement that lists and identifies the parties' assets and liabilities, or any document filed with the court incidental to the declaration or agreement that lists and identifies financial information. [¶] (d) The party making the request to seal a pleading pursuant to subdivision (a) shall serve a copy of the pleading on the other party to the proceeding and file a proof of service with the request to seal the pleading. [¶] (e) Nothing in this section precludes a party to a proceeding described in this section from using any document or information contained in a sealed pleading in any manner that is not otherwise prohibited by law."

redaction on the litigant would contravene the Legislature's intention to put that responsibility on journalists and the public. (135 Cal.App.4th at pp. 1069–1070.)

In a like vein, section 1785.11.2 cannot be judicially reformed so as to permit the statute to apply to plaintiff. The text of section 1785.11.2 and the legislative committee reports that preceded its adoption are such that we cannot "say with confidence" that the trial court's proposed rewriting of the statute, or any other redrafting, would "closely effectuat[e] policy judgments clearly articulated by" the Legislature. (*Kopp v. Fair Pol. Practices Com., supra,* 11 Cal.4th at p. 615.) The trial court's construction that prevents a consumer from freezing information "contained in and/or obtained from public records" permits the disclosure to plaintiff's customers of the very information the Legislature sought to keep confidential—names, Social Security numbers, addresses, tax information, rental records, and judgments. The Legislature intended to allow consumers to prevent disclosure of *any* information in a credit reporting agency report; not merely that "contained in and/or obtained from public records" as the trial court's reformation order permits. There is no evidence the Legislature intended to enact a statute that permitted a consumer to freeze disclosure of everything except information "contained in and/or obtained from public records." No committee reports suggest if a consumer can freeze only information not "contained in and/or obtained from public records," there will be the comparable protections against identity theft section 1785.11.2 was designed to provide. Moreover, the Legislature intended to require a credit reporting agency, upon receiving the consumer's written request, to freeze the release of all of her or his information. (§ 1785.11.2, subd. (a).) Once the written notification is received, *no* information may be released and the only information that may be provided by the credit reporting agency is that a security freeze is in effect. The Legislature never intended, much less even contemplated, that once the consumer's written notice was received, the credit reporting agency would have to peer over the information to ascertain whether there is data which is not "contained in and/or obtained from public records" as the trial court's order in effect requires. Section 1785.11.2 cannot be reformed as defendants assert. (*Metromedia, Inc. v. City of San Diego, supra,* 32 Cal.3d at pp. 190–191; *In re Marriage of Burkle, supra,* 135 Cal.App.4th at pp. 1068–1070.) Therefore, section 1785.11.2 cannot be enforced in any respect as to plaintiff.

## C. Facial Challenge

The trial court enjoined the enforcement of section 1785.11.2 as to credit reports containing information derived from public records. There has been no evidentiary showing as to: the manner in which credit reporting agencies other than plaintiff secure their information or their sources; the

format and contents of their reports; or the dangers of false information in credit reports from other credit reporting companies. As noted, a facial challenge to a statute cannot be upheld unless the challenged enactment presents a "total and fatal" conflict with applicable constitutional prohibitions. (*Tobe v. City of Santa Ana, supra,* 9 Cal.4th at p. 1084; see *Arcadia Unified School Dist. v. State Dept. of Education, supra,* 2 Cal.4th at p. 267.) The Supreme Court has explained: "Unconstitutionality must be clearly, positively, and certainly shown by the party attacking the statute, and we resolve doubts in favor of the statute's validity. [Citations.]" (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1302 [48 Cal.Rptr.3d 183, 141 P3d. 288]; *Lockyer v. City and County of San Francisco* (2004) 33 Cal.4th 1055, 1086 [17 Cal.Rptr.3d 225, 95 P.3d 459].)

The parties agree there is a compelling state interest in the prevention of identity theft which means that concern can serve as a basis for a consumer restricting disclosure of private information like a Social Security number. Further, section 1785.11.2 can validly apply if there are fraudulent misrepresentations in a credit report as there is no First Amendment right to use commercial speech to make fraudulent or misleading statements. (*Zauderer v. Office of Disciplinary Counsel of Supreme Court, supra,* 471 U.S. at p. 638 ["The States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading"]; *Kasky v. Nike, Inc., supra,* 27 Cal.4th at p. 953 [" '[T]here is no constitutional value in false statements of fact' "].) If a credit report contains only false information, then section 1785.11.2 could constitutionally be used to prevent its release. There are logically conceivable circumstances where a consumer can forestall the release of credit information the Constitution does not protect. Hence, in terms of a facial challenge, defendants have demonstrated that there is not a "total and fatal" conflict between section 1785.11.2 and the First Amendment. (*Tobe v. City of Santa Ana, supra,* 9 Cal.4th at p. 1084; see *Arcadia Unified School Dist. v. State Dept. of Education, supra,* 2 Cal.4th at p. 267.) There is no merit to plaintiff's facial invalidity contentions. Therefore, the trial court could not restrain enforcement of section 1785.11.2 against other credit reporting agencies.

One brief word is in order concerning *U.D. Registry, Inc. v. State of California, supra,* 34 Cal.App.4th at pages 111–116. *U.D. Registry, Inc.* was limited to the issue of restrictions on credit agencies truthfully reporting the results of unlawful detainer proceedings pursuant to section 1785.13, subdivision (a)(3). (See, *ante,* at pp. 420–421.) The competing interests in *U.D. Registry* were identified thusly: "The tension here is between the First Amendment right to free speech and the Legislature's desire to protect prospective tenants by limiting the information a credit agency may report regarding a tenant's involvement in unlawful detainer actions." (*U.D. Registry, Inc. v. State of California, supra,* 34 Cal.App.4th at p. 109.) The state interest

here is more profound, the protection of consumers against identity theft. Further, our Division Four colleagues were not dealing with a broadly worded injunction as is present here which bars enforcement of a statute which can be validly enforced under reasonably imaginable circumstances. The problem with section 1785.13, subdivision (a)(3) is there are no circumstances where the state can prevent the truthful disclosure of the unlawful judgments at issue in that case. Regardless of whether it was characterized as pure or commercial speech, section 1785.13, subdivision (a)(3) was in "total and fatal" conflict with the First Amendment and our Division Four colleagues correctly found it to be unconstitutional. Here, depending on the contents or format of a credit report, a consumer can, with the state's constitutional assistance and imprimatur as specified in section 1785.11.2 prevent the disclosure of false information or data that can facilitate the commission of identity theft—such issues were not present in *U.D. Registry, Inc.* As a result, *U.D. Registry, Inc.* is not controlling in terms of the facial invalidity issue.

For the first time in the rehearing petition, plaintiff argues the requirement recognized in *Tobe v. City of Santa Ana, supra,* 9 Cal.4th at page 1084 that a party mounting a facial attack on a statute demonstrate the challenged provision presents a "present total and fatal conflict" with the applicable constitutional prohibition does not apply to an overbreadth question in the free expression context. Plaintiff's analysis is incorrect. (*Secretary of State of Md. v. J. H. Munson Co.* (1984) 467 U.S. 947, 967–968 [81 L.Ed.2d 786, 104 S.Ct. 2839] ["Where, as here, a statute imposes a direct restriction on protected First Amendment activity, and where the defect in the statute is that the means chosen to accomplish the State's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech, the statute is properly subject to facial attack." (Fn. omitted.)]; *People v. Stanistreet* (2002) 29 Cal.4th 497, 511, fn. 5 [127 Cal.Rptr.2d 633, 58 P.3d 465].) Moreover, as noted, insufficient evidence was presented to support the trial court's facial overbreadth conclusions. The evidence before the trial court related to *plaintiff's* credit reports. There was no evidence as to industry wide practices or other credit reporting agency's reports. Plaintiff presented *no* evidence as to whether section 1785.11.2 impinges upon the free expression rights of a substantial portion of those credit reporting agencies to whom it applies. (See *American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 348 [66 Cal.Rptr.2d 210, 940 P.2d 797].)

## IV. OTHER ISSUES*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 405.

## V. DISPOSITION

The September 9, 2004 judgment in case No. B179653 is reversed. The April 13, 2005 postjudgment order awarding attorney fees in case No. B186012 is affirmed. Upon issuance of the remittitur, the trial court is to issue a new injunction consistent with the views expressed in this appeal. Plaintiff, U.D. Registry, Inc., is to recover its costs incurred on appeal from defendants, State of California and Bill Lockyer. Any issue of attorney fees on appeal is to be pursued pursuant to rule 870.2(c) of the California Rules of Court.

Kriegler, J., concurred.

**ARMSTRONG, J.,** Dissenting.—I respectfully dissent.

According to the complaint in this action, U.D. Registry, Inc. (UDR) is a credit reporting agency serving the rental housing industry: "In order to assist landlords, property managers and others in determining the eligibility of a consumer for hiring of a dwelling, UDR maintains a database on unlawful detainers and other public records on tens of millions of prospective tenants throughout the state of California and other states."

UDR brought this lawsuit against the State of California to enjoin the enforcement of Civil Code section 1785.11.2 (the Freeze Statute) because, among other things, the statute "on its face, unconstitutionally limits UDR's right to discuss all judicial proceedings . . ." and thus "by its own terms abridges the right of free speech with respect to this Plaintiff and others similarly situated in direct contravention of both the California and Federal Constitutions." As UDR explained in its trial brief, "At issue in this case is whether a State may pass and enforce a statute that gives consumers the right to completely suppress the dissemination of truthful and lawfully obtained public record information by third parties about entirely lawful activity in order to provide consumers a greater right to privacy and control over information that is already within the public domain."

In *U.D. Registry, Inc. v. State of California* (1995) 34 Cal.App.4th 107 [40 Cal.Rptr.2d 228] (*UDR I*), our colleagues in Division Four of this District Court of Appeal unequivocally answered this question, ruling that Civil Code section 1785.13, subdivision (a)(3),[1] the statute there in question, violated UDR's First Amendment rights "because it prohibits truthful reporting of 'information contained in court files that are fully available to the public and which

---

[1] The statute at issue in *UDR I* provided that "No consumer credit reporting agency shall make any consumer credit report containing any of the following items of information: . . . [¶] (3) Unlawful detainer actions, unless the lessor was the prevailing party. . . ." (Civ. Code, § 1785.13, subd. (a)(3).) Thus, the statute made unlawful UDR's disclosure to its client landlords of unlawful detainer information which it obtained from the public records.

can be freely reported and copied by any other person, entity or member of the media.' " (34 Cal.App.4th at pp. 110–116.)

Like the statute at issue in *UDR I*, the Freeze Statute, prohibits the "truthful reporting of 'information contained in court files that are fully available to the public and which can be freely reported and copied by any other person, entity or member of the media.' " (*UDR I, supra*, 34 Cal.App.4th at p. 110.) Consequently, it is, as the trial court found, facially unconstitutional.

Contrary to the majority, I agree with the trial court that the Freeze Statute may be reformed to preserve it against invalidation. Under California law, "[i]nvalid provisions of a statute should be severed whenever possible to preserve the validity of the remainder of the statute. [Citations.]" (*Briseno v. City of Santa Ana* (1992) 6 Cal.App.4th 1378, 1384 [8 Cal.Rptr.2d 486].) As our Supreme Court has explained: ". . . a court may reform—i.e., 're-write'—a statute in order to preserve it against invalidation under the Constitution, when we can say with confidence that (i) it is possible to reform the statute in a manner that closely effectuates policy judgments clearly articulated by the enacting body, and (ii) the enacting body would have preferred the reformed construction to invalidation of the statute." (*Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 660–661 [47 Cal.Rptr.2d 108, 905 P.2d 1248].)

The purpose of the Freeze Statute is to prevent identity thieves from obtaining new credit by preventing a prospective credit issuer from reviewing the victim's credit history, and thus using the victim's good credit history to extend new credit to a thief. I believe that this purpose would be closely effectuated by the trial court's reformation, which in effect excised the ineffective method of preventing identity theft (prohibiting the dissemination of *public* credit information, such as unlawful detainer actions and bankruptcy filing, which would disincline a creditor to extend new credit, and is thus useless to a thief) while leaving intact the effective method (prohibiting dissemination of *private* credit information). Moreover, "[t]here is no persuasive reason to suppose" that the inclusion of public credit information "was so critical to the enactment of [the statute] that the measure would not have been enacted in its absence." (*Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 822 [258 Cal.Rptr. 161, 771 P.2d 1247].) Like the trial court, I feel confident that the Legislature would have preferred the reformed construction of the Freeze Statute to its invalidation.

Finally, this case was brought and tried as a *facial* challenge to the Freeze Statute. Indeed, UDR does not have standing to bring an *as-applied* challenge, since it has never been subject to an enforcement action based on the statute. (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d

402, 892 P.2d 1145] ["If a plaintiff seeks to enjoin future, allegedly impermissible, types of applications of a facially valid statute or ordinance, the plaintiff must demonstrate that such application is occurring or has occurred in the past. . . . The [United States] Supreme Court [has] held that the as applied challenge could be resolved only by considering how the statute was being administered."].) Consequently, I do not agree with the majority's analysis of the constitutional issue presented in this case.

In sum, the trial court enjoined the enforcement of the Freeze Statute to the extent that it "seeks to prevent the dissemination and reporting by consumer credit reporting agencies of any information contained in and/or obtained from matters of public record, and to the extent that the Freeze Statute seeks to preclude plaintiff from disseminating and reporting information contained in the public record. . . ." The effect of the majority opinion is to limit the reach of the injunction to a single consumer credit reporting agency, UDR. Because I believe that the Freeze Statute as written is unconstitutional to the extent that it precludes the dissemination by any consumer credit reporting agency of information contained in and/or obtained from the public record, I respectfully dissent.

A petition for a rehearing was denied November 29, 2006, and the opinion was modified to read as printed above. The petition of appellant The U.D. Registry, Inc., for review by the Supreme Court was denied February 7, 2007, S148641. Kennard, J., was of the opinion that the petition should be granted.